**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

K.N.N., R.N., C.M., E.U.,

          Plaintiffs,

   -against-

UNITED STATES OF AMERICA; U.S.
DEPARTMENT OF HOMELAND
SECURITY; ALEJANDRO N.
MAYORKAS, in his official capacity as
Secretary of the Department of Homeland
Security; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; and
PATRICK LECHLEITNER, in his official
capacity as Acting Director of U.S.
Immigration and Customs Enforcement,

        Defendants.

---

## COMPLAINT

---

### INTRODUCTION

1.      This case is about the negligent and wrongful acts and omissions of federal officers of the United States of America, egregious and intentional failure to follow and implement their own policies and regulations, and the resulting harm inflicted on four detained asylum seekers from Cameroon, all of whom were placed in a full-body restraint device called "The WRAP" before deportation flights.

2.      Plaintiffs bring claims against the United States under the Federal Tort Claims Act because individual officers of Immigration and Customs Enforcement ("ICE") undertook

severe and retaliatory abuse of Plaintiffs and other Black asylum seekers while they were in detention.

3.        High-level officers at the headquarters of the Department of Homeland Security ("DHS") and ICE have been well-aware of abuses of detained individuals in ICE custody during the period relevant to this complaint yet did nothing to remediate these abuses or enforce existing agency policies and regulations that proscribe the abuses at issue here. They received and responded to complaints, Congressional letters, media inquiries, State Department communications, and other correspondence regarding the abuses in detention and the deportation flights, and—rather than halt the deportation flights—they designated them as "Special High Risk Charters." This designation placed a SWAT team of officers on the flights who were predisposed to using force and unnecessary restraints, including using them as a threat and warning to those being deported not to question the officers in any way.  The persistent failure of high-level DHS and ICE officials to comply with their own policies and hold individual officers accountable for the abuse Plaintiffs and others complained of contributed to a culture of impunity, violence, and racism among individual ICE officers and led to Plaintiffs' mistreatment.

4.        The case is also brought against DHS and ICE under the Administrative Procedure Act ("APA"), for ICE and DHS's failure to follow agency guidelines, in violation of the *Accardi* doctrine.

5.        Plaintiffs are four Cameroonian nationals who came to the United States seeking asylum from persecution by the Cameroonian government. They are members of Cameroon's English-speaking, Anglophone minority, which has been targeted by government security forces since 2017, resulting in a massive humanitarian crisis.[1]

---

[1] *See* HUMAN RIGHTS WATCH, WORLD REPORT 2023: *Cameroon, Events of 2022* (2023) https://www.hrw.org/world-report/2023/country-chapters/cameroon.

6.       After requesting asylum in the U.S., Plaintiffs were placed in immigration detention in the custody of DHS and ICE. During their detention, Plaintiffs experienced numerous abuses at the hands of U.S. government officers and agencies. In particular, Plaintiffs were subjected to physical abuse, medical neglect, and improper use of restraints, including a full-body restraint device called The WRAP. This abuse caused them severe physical and mental harm.

7.       As Human Rights Watch found after an extensive investigation, Plaintiffs were part of a group of asylum seekers from Cameroon during the Trump administration who faced high rates of deportation despite credible claims; faced prolonged detention; and suffered mistreatment during detention, transfers, and flights. [2]

8.       Plaintiffs and other Black migrants, largely Cameroonian, spoke out about horrid detention conditions and racist treatment in 2020. Their concerns were amplified through media reports, congressional letters, and civil rights complaints detailing abusive forms of ICE retaliation, including gratuitous and unlawful use of force, pepper spray, and punitive solitary confinement, leveled against Cameroonians in detention leading up to the October and November 2020 flights.

9.       ICE proceeded with the deportation flights despite these allegations and other communications, classifying their flights on October 13 and November 11, 2020, as "Special High Risk Charters" from the Fort Worth Alliance Airport in Fort Worth, Texas, to Douala, Cameroon.

10.      ICE agents also used physical force and took retaliatory action against Plaintiffs and other Cameroonians. They cruelly shackled Plaintiffs and threatened them with violence to force them onto flights to facilitate their deportation. Plaintiffs were all placed in The WRAP restraint device before flights, with some remaining in the device during hours of the transatlantic

---

[2] *U.S.: Deported Cameroonian Asylum Seekers Suffer Serious Harm*, Human Rights Watch (Feb. 10, 2022), https://www.hrw.org/news/2022/02/10/us-deported-cameroonian-asylum-seekers-suffer-serious-harm.

flight. One Plaintiff, EU, was boarded on both flights, placed in The WRAP restraint device both times, and then removed from the flights, the second time for emergency medical treatment in an ambulance at the airport.

11.    Defendants' treatment of Plaintiffs and other Cameroonian asylum seekers is part of a practice of abuse, discrimination, and retaliation by ICE.  Black asylum seekers from Africa and the Caribbean have repeatedly reported experiencing serious impediments to seeking asylum in the U.S. and harms in immigration detention, including racist targeting, physical and verbal abuse, and higher rates of detention, solitary confinement, and denial of asylum claims.[3] Plaintiffs, along with other Cameroonians and other Black migrants detained with them, filed multiple complaints with DHS's office of Civil Rights and Civil Liberties (CRCL), including about the abuse suffered due to ICE's improper use of The WRAP. They are unaware of any formal actions or changes in ICE's operations in response to those complaints.

12.    In the last decade, there have also been "allegations of egregious physical abuse" on deportation flights, including reports of ICE officers using beatings, taser shocks, "body bag"-like restraint devices, shackles, and denying access to the bathroom during lengthy flights.[4] Inspectors within DHS have also found evidence of abuse, racist treatment, and retaliation after detained individuals submitted grievances and complaints.[5]

---

[3] *See, e.g.*, *Black Immigrant Lives Are Under Attack*, RAICES (Jul. 2020), https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/; *US Discrimination Against Black Migrants, Refugees and Asylum Seekers at the Border and Beyond*, (Aug. 2022) https://humanrightsfirst.org/wp-content/uploads/2022/08/CERD-1pger_US-Discrimination-Against-Black-Migrants-Refugees-and-Asylum-Seekers-at-the-Border-and-Beyond.pdf
[4] *Hidden in Plain Sight: ICE Air and the Machinery of Mass Deportation*, Univ. of Wash. Ctr. for Hum. Rts. (April 23, 2019) https://jsis.washington.edu/humanrights/2019/04/23/ice-air/.
[5] Tom Dreisbach, *Government's Own Experts Found 'Barbaric' and 'Negligent' Conditions in ICE Detention*, NPR (Aug. 16, 2023) https://www.npr.org/2023/08/16/1190767610/ice-detention-immigration-government-inspectors-barbaric-negligent-conditions.

13.     FOIA litigation concerning materials about the October and November 2020 deportation flights to Cameroon revealed that federal officials hold disturbing and racist attitudes towards Black migrants and treat mass deportations as a sport.[6] In one email chain, ICE "Attachés for Removal" use sports terms to refer to missing out on the deportation of African immigrants due to lack of travel documents: "don't need to be 0-2... still losing sleep over the last Gabon [deportation] we had to drop."[7]

14.     Furthermore, upon their arrival in Cameroon, Plaintiffs KNN, RN, and CM faced interrogation, detention, and physical abuse at the hands of the Cameroonian government. They secured their release only by paying bribes or escaping. This occurred because ICE officers refused Plaintiffs the access and time needed to remove sensitive asylum documents from their bags, resulting in the U.S. handing over such documents upon Plaintiffs' arrival in Cameroon on the deportation flight.

15.     Human Rights Watch has extensively documented the culpability of U.S. government officials in subjecting Plaintiffs KNN, RN, CM, and other Cameroonians to this abuse. Human Rights Watch documented multiple examples of "ICE refusing to allow people to remove asylum documents from their luggage prior to deportation, resulting in their de facto transfer to the Cameroonian authorities."[8] The failure to do so—according to ICE's own protocol—left these asylum seekers at an obviously foreseeable and heightened risk of persecution upon return to their home country. Human Rights Watch also found that Cameroonian deportees were subjected to

---

[6] Ctr. for Const. Rts., *Briefing Guide: The U.S. Government's Systematic Mistreatment of Cameroonian and Other Black Migrants* (Feb. 6, 2023),
https://ccrjustice.org/sites/default/files/attach/2023/02/CCR%20SPLC%20Proj%20South%20Briefing%20Guide%202-6-23.pdf.
[7] *Id.*
[8] *U.S.: Deported Cameroonian Asylum Seekers Suffer Serious Harm*, Human Rights Watch (Feb. 10, 2022),
https://www.hrw.org/news/2022/02/10/us-deported-cameroonian-asylum-seekers-suffer-serious-harm.

"serious human rights violations including rape, torture and other physical abuse, arbitrary arrest and detention, inhuman and degrading treatment in detention, extortion, and threats" at the hands of the government.[9]

16.     Plaintiffs bring this action under the FTCA and APA seeking redress for the extraordinary harms they suffered at the hands of DHS and ICE officials.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction in this case, which arises under federal law, pursuant to 28 U.S.C. § 1346(b), because this is a civil action against the United States for personal injury caused by the negligent and wrongful acts and omissions of government employees.

18.     This action is also brought under the Administrative Procedure Act ("APA"). Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. § 702, and pursuant to 28 U.S.C. § 1331.

19.     This Court can enter declaratory, injunctive, and further necessary or proper relief to recognize and remedy the underlying violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief), 5 U.S.C. § 706 (agency action), and the Court's inherent equitable powers.

20.     On July 29, 2022, Plaintiffs each submitted an administrative claim to DHS, ICE, and the Department of Health and Human Services ("HHS") pursuant to 28 U.S.C. § 2675(a).

21.     DHS and ICE issued a final denial of the claims of KNN, CM, and RN on March 20, 2023, and of plaintiff EU on March 29, 2023. Accordingly, Plaintiffs have exhausted all potential administrative remedies under 28 U.S.C. § 2401(b).

---

[9] *Id.*

22.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(A) and (B) and 5 U.S.C. § 703 for claims arising under the APA.

23.     Venue is proper under 28 U.S.C. § 1402(b) because a substantial part of the acts and/or omissions giving rise to the claims herein occurred in the District of Columbia.

24.     DHS and ICE officials in the District of Columbia were repeatedly on notice of abusive, retaliatory behavior by ICE officials in using unlawful force in detention and deportation, and especially in using force against Cameroonian migrants in 2020 and using restraints improperly in removal flights. DHS and ICE officials in the District of Columbia were ultimately responsible for promulgating agency guidelines to safeguard against the kind of breaches of confidentiality and violations of policies and regulations that occurred here. The acts and omissions of District of Columbia-based officials contributed to the abuses Plaintiffs endured. DHS and ICE officials in the District of Columbia directly oversaw conditions at the detention facilities, coordinated logistics for the October 13 and November 11, 2020, removal flights and designated them as Special High Risk Charters, and responded to inquiries about the flight from the Department of State, Congressmembers, journalists, and advocates.

## PARTIES

*Plaintiffs*

25.     Plaintiff KNN is a 32-year-old Cameroonian man who sought asylum in the United States after being persecuted by the Cameroonian government. He was detained in the U.S. for over two years. He currently lives in hiding in Nigeria after he was deported to Cameroon on November 11, 2020, was detained, released after a bribe, and fled Cameroon in fear.

26.     Plaintiff RN is a 40-year-old Cameroonian man who sought asylum in the United States after being persecuted by the Cameroonian government. He was detained for nearly

three years. He currently lives in hiding in Ghana after he was deported to Cameroon on October 13, 2020, was detained, escaped from custody, and fled Cameroon in fear.

27.    Plaintiff CM is a 35-year-old Cameroonian man who sought asylum in the United States after being persecuted by the Cameroonian government. He was detained for over a year. He currently lives in hiding in Ghana after he was deported to Cameroon, was detained for interrogation, released after a bribe, and fled Cameroon in fear.

28.    Plaintiff EU is a 43-year-old dual citizen of Cameroon and Nigeria who sought asylum in the United States after being persecuted by the Cameroonian and Nigerian governments. He was detained for over two years. After being placed on and removed from both the October 13 and November 11, 2020, flights, he was released from detention in December 2020 and has since been granted Temporary Protected Status. His asylum case was reopened by the BIA and is pending before the Phoenix Immigration Court.

***Defendants***

29.    Defendant United States of America is an appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b), 2671, *et seq*.

30.    Defendant U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of ICE.

31.    Defendant Alejandro Mayorkas is the Secretary of DHS. In this capacity, Mayorkas is ultimately responsible for the actions of ICE. He is the legal custodian of all people detained in immigration detention facilities. Defendant Mayorkas is sued in his official capacity.

32.    Defendant ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants. ICE discharges its

responsibility in part by promulgating detention standards to be followed in the facilities in which immigrants are held pending removal hearings.

33.     Defendant Patrick Lechleitner is the Acting Director of ICE. In this capacity, Lechleitner is responsible for ICE's policies and practices regarding immigration detention and removal and oversight of the immigration detention and removal systems. Defendant Lechleitner is sued in his official capacity.

## STATEMENT OF FACTS

### I.     Background

34.     Plaintiffs are asylum seekers from Cameroon who were detained by ICE for periods ranging from one to nearly three years between January 2018 and December 2020. They were detained at various immigration detention facilities in Alabama, Florida, Louisiana, Mississippi, and Texas. Officers subjected Plaintiffs to various forms of abuse in detention, including the unlawful use of physical force and restraints.

35.     All four Plaintiffs were subjected to the unlawful use of a full-body restraint device called "The WRAP." The WRAP restrains the legs, with the arms cuffed at the back. It is supposed to leave the restrained individual seated, upright, in a 90-degree position so that the lungs and airways are free from compression. Below is a photograph of The WRAP from the website of the manufacturer:



36.      According to The WRAP's manufacturer, the device is a temporary restraint system designed for emergency stabilization only, and no one should ever be left alone in The WRAP. The manufacturer cautions that if anyone being restrained "complains of or exhibits any medical concerns, seek immediate medical attention," and that harnesses "should not be tightened to the point that it may interfere with the subject's ability to breathe."[10]

37.      But instead, Plaintiffs were restrained in The WRAP to silence them and other migrants and punish them for previous protests. They were left alone in the device for hours in some instances as they tried to alert officers to their medical issues and pain from the tightened strap folding their bodies into an acute angle stress position.

38.      Not only were Plaintiffs physically abused, but the confidentiality of their asylum cases was disregarded by ICE officers. This resulted in Plaintiffs being subjected to even greater hardships and persecution when they arrived back in Cameroon.

## II. Plaintiffs' Mistreatment in Immigration Detention & Removal

---

[10] Safe Restraints, Inc., *The WRAP, Basic Application Manual* (Aug. 2014) at 13. *See also id.* at 9 ("*Do not over-tighten*" the tether strap connecting the chest to the person's legs (emphasis in original)) [hereinafter 2014 Manual]. http://www.aflunky.com/uploads/2/3/4/3/23436122/the-wrap-training-manual_8_14.pdf

A.  **Plaintiffs' Arrival, Detention, and Medical Conditions**

    i.  **KNN**

39.      KNN fled Cameroon to seek asylum in the United States after facing persecution, including physical abuse and torture, in Cameroon. He arrived at the San Ysidro, California port of entry to seek asylum on September 16, 2018.

40.      KNN passed a credible fear interview on October 9, 2018, but ICE continued to detain him for over two years. Between his entry and his deportation in November 2020, he was detained in Tallahatchie County Correctional Facility in Mississippi, Pine Prairie Detention Center in Louisiana, La Salle Detention Facility in Louisiana,[11] and Etowah County Jail in Alabama.[12]

41.      During his detention, KNN suffered from gastrointestinal bleeding due to an ulcer, anemia, and hypertension. KNN sent in numerous medical requests throughout his detainment but failed to receive proper treatment. For his gastrointestinal issues and anemia, he was given ibuprofen and told to drink more water. He also continued to have pain, including in his lower back and hip, resulting from injuries that he sustained in Cameroon. He reported this to medical staff as well.

42.      In January 2019, KNN became depressed after receiving the Immigration Judge's decision denying asylum. He told the doctor at Pine Prairie that he was unable to sleep but did not have thoughts of killing himself or hurting others. Nevertheless, he was shackled and

---

[11] This facility is now renamed the "Central Louisiana ICE Processing Center."
[12] ICE decided to close the Etowah County Detention Center in 2022, citing its "long history of serious deficiencies identified during facility inspections." Press Release, U.S. Immigr. & Customs Enf't., *ICE to Close Etowah Detention Center* (Mar. 25, 2022) https://www.ice.gov/news/releases/ice-close-etowah-detention-center [hereinafter Etowah].

transferred to the La Salle Detention Facility, where he was left alone and naked in a freezing cold cell, without a mattress or a blanket. After two days, he was transferred back to Pine Prairie.

43.        KNN lost his appeal to the Board of Immigration Appeals ("BIA") in June 2019. He attempted to file an appeal to the Fifth Circuit but was given the wrong court address by staff at the Etowah Detention Center. He sent an appeal to the Fifth Circuit in July 2019, which was pending at the time of his removal in 2020.

                    **ii.  RN**

44.        RN arrived in the United States in January 2018 to seek asylum. In late 2016, he was brutalized by police officers and military officials in Cameroon, who whipped him with an electric cable, beat the soles of his feet with a machete, and kicked him in the genitals.

45.        RN was initially detained in Texas, then sent to several facilities in Florida, including Broward Transitional Center in Pompano Beach, Baker County detention facility in Macclenny, Wakulla County Correctional Facility in Crawfordville, and Krome Servicing Processing Center in Miami. Around August 2019, he was transferred to Adams County Correctional Center in Natchez, Mississippi.

46.        RN suffered from depression, anxiety, chest pain, and sciatica. His sciatica caused pain that radiated from his back down his leg. He also continued to have pain on the soles of his feet and in his genital area from the torture in Cameroon.

47.        RN requested medical care in detention for these ailments. He was repeatedly seen for pain at various detention centers and given only Tylenol and ibuprofen. The cause of the nerve pain was not diagnosed.

48.        While detained at Baker County jail, RN frequently had dizzy spells. One day, RN was feeling so ill that he collapsed during breakfast at Baker County and had to be carried away on a stretcher.

49.     ICE's Miami Field Office reviewed RN's custody while he was in Florida and issued a notice dated April 19, 2019, deciding to keep him detained.

50.     After being transferred to Adams County jail in Mississippi, RN began to have blurry vision. He asked for glasses but never received them.

51.     On or about April 9, 2020, RN tested positive for COVID-19 at Adams County and was put in isolation in his cell for approximately three weeks. His mental health suffered greatly due to the prolonged isolation. He couldn't sleep and wanted to hurt himself. He thought he wouldn't leave Baker County alive. When the isolation period ended, RN submitted a request to ICE to be released on humanitarian parole due to his physical and mental health conditions, but it was denied. His ailments grew worse after contracting COVID-19.

52.     In June 2020, RN was prescribed Wellbutrin (bupropion) and Remeron (mirtazapine) for his mental health conditions, as well as Meloxicam for his joint pain. He also suffered from chest pains, which may have been related to anxiety, and saw a doctor again for this concern in or around June 2020.

53.     A sick-call request that RN submitted in July 2020 once again requested medical attention for the pain in his feet and swelling in his genital area.

54.     He continued to suffer from depression, anxiety, and pain throughout his time in detention.

55.     An immigration judge denied RN's asylum application on August 29, 2018, and the BIA affirmed on January 22, 2019. RN filed a pro se appeal with the U.S. Court of Appeals for the Eleventh Circuit on February 20, 2019, along with a request for a stay of removal. He also filed a motion to reopen with the BIA. The Fifth Circuit denied his stay request on March 20, 2019,

and dismissed his appeal on June 12, 2019, for failure to pay the docketing fee. The BIA denied

his motion to reopen on June 25, 2019.

### iii.  **CM**

56.      CM arrived in the United States in July 2019 after being persecuted by the

Cameroonian government and immediately asked for asylum. After CM arrived at the border, he

was taken to a detention facility in Arizona for a couple of days then transferred to a detention

facility in Mississippi. CM spent approximately two months in Mississippi before being transferred

to Jackson Parish Correctional Center in Louisiana.

57.      CM suffers from asthma and requires the use of an inhaler. Additionally, his

hearing in his right ear was impaired after a military officer in Cameroon fired a gun next to his

ear.

58.      ICE was aware of CM's medical conditions, but he received little medical care

at Jackson Parish Correctional Center in Louisiana beyond an inhaler.

59.      CM found no relief from his asthma symptoms in detention. His symptoms only

grew worse as COVID-19 raged through Jackson Parish Correctional Center. On many occasions,

he struggled to breathe. At one point, he asked to be tested when he thought that he had contracted

COVID-19, but ICE refused to test him.

60.      In December 2019, CM asked to see a doctor because it was becoming

increasingly harder for him to hear out of his right ear. He was not allowed to see a doctor until

almost a year later, in October 2020. At that point, testing indicated that his hearing was

substantially impaired. The doctor ordered a head scan, but it was never performed. Instead, ICE

began the process of deportation.

61.    CM was denied parole each time he petitioned, including after he hired an attorney to help him submit a new petition during 2020 when he feared contracting COVID-19 in detention. An immigration judge ordered CM's removal from the U.S. on February 21, 2020, and the BIA affirmed on July 22, 2020. CM submitted a motion to reopen to the BIA, which was also denied on November 10, 2020.

### iv.  EU

62.    EU arrived in the United States in August 2018 after being persecuted by the Cameroonian and Nigerian governments and immediately asked for asylum.

63.    Between August 2018 and December 2020, he was transferred numerous times between detention centers in Texas, Louisiana, Alabama, Mississippi, New Jersey, and New York.

64.    Prior to his arrival in the United States, EU had suffered a heart attack in South Korea, where he was pursuing graduate studies. He was diagnosed with coronary artery disease and had a stent inserted at a hospital there.

65.    His medical records from Etowah Detention Center in Alabama indicate that ICE was aware that EU suffered from coronary heart disease, depression, gastrointestinal reflux, and hypertension. He was given medication for his depression and hypertension. While detained at Etowah, he suffered from chest pain and was referred to a cardiologist, but the consultation never took place.

66.    EU initially submitted a pro se request to be released on parole in 2018, shortly after being detained. ICE denied that request on or about September 14, 2018.  On or about July 7, 2020, during the COVID-19 pandemic, EU, with the assistance of an attorney, submitted a request for a custody review based on the district court injunction in *Fraihat*. The request stated that EU was at high risk of serious illness from COVID-19 based on his prior heart attack, which

had necessitated placement of a stent in one of his coronary arteries. ICE still refused to release him.

67.        On or about October 26, 2020, EU submitted another application to be released on humanitarian parole, and was interviewed on or about November 4, 2020. The New Orleans ICE ERO Field Office issued a decision denying parole on November 9, 2020. On November 27, 2020, EU requested reconsideration of his parole denial and also requested another custody review under *Fraihat*, once again citing his coronary artery disease.  An ICE officer first responded by stating in an email to EU's attorney that the medical records submitted were "not a diagnosis," although EU's medical records from Etowah stated "H/O CAD," meaning history of coronary artery disease. EU's attorney then emailed additional medical records documenting the stent procedure that had been performed in South Korea.

68.        On December 2, 2020, ICE finally agreed to release EU. At that time, he was detained in Louisiana. However, instead of releasing him that day, ICE transferred him once again to Etowah in Alabama. EU was finally released on or about December 3, 2020, after arriving in Alabama. He moved to Phoenix, Arizona, to join his wife and children.

69.        On February 20, 2021, the BIA reopened EU's asylum case. His asylum case is currently pending with the Phoenix Immigration Court. On May 18, 2023, EU was granted Temporary Protected Status in the United States.

**B.  Despite Protests and Public Outcry, Plaintiffs Were Scheduled for Deportation on October 13 and November 11, 2020.**

70.        Officials at DHS and ICE headquarters directly coordinated the planned October and November 2020 deportation flights and planned to remove each of the Plaintiffs.

71.     ICE and DHS planned these removals during a period when they knew that detained Cameroonians were protesting their mistreatment and raising concerns about their security if they were deported to Cameroon.

72.     In March and August of 2020, approximately forty-five Black, majority Cameroonian asylum seekers engaged in peaceful hunger strikes in Pine Prairie, Louisiana. As four human rights groups reported to the Office of Civil Rights and Civil Liberties ("CRCL") and the DHS Office of Inspector General on August 26, 2020, they were "protesting their indefinite detention; racist treatment and conditions of confinement; blanket parole denials, particularly to Cameroonians and other Black applicants; across-the-board failure to respond to pro se parole applications; false promises and statements from ICE regarding the sincerity of their custody reviews; and the inhumanity of being imprisoned during a global pandemic."[13] They called on the agency to halt deportations to Cameroon and investigate the violence and discriminatory practices against Black asylum seekers, including the use of force, use of punitive solitary confinement, and denial of basic necessities like water for Cameroonians who engaged in protests and hunger strikes in Pine Prairie ICE Processing Center in Louisiana.[14]

73.     The complaint reported that ICE officers misrepresented parole and immigration law standards to the protestors and noted that they had been trained to "deport as many of you as possible."[15]

---

[13] Southern Poverty Law Center et al., *Call for an Immediate Halt to and Investigation of Detention, Violence, Repression and Racism Against Peacefully Protesting Cameroonian and Black Asylum Seekers, and other Asylum Seekers, at Pine Prairie ICE Processing Center; and the release of all Black Hunger Strikers from Solitary Confinement* (Aug. 26, 2020), https://www.splcenter.org/sites/default/files/8.26.20_crcl_letter.pdf.
[14] *Id.*
[15] *Id.*

74.     Eight Cameroonian men reported that ICE and facility officers engaged in beatings and physical abuse, improper use of restraints, and pepper spray against individuals who declined to sign documents related to their removal. Their independent testimony reports that ICE officers brought them to a dorm called Zulu, where there were, reportedly, no cameras, and which is known amongst the men as a place where those who are punished are taken.[16]

75.     There were also allegations that the travel documents issued were invalid.

76.     Human rights organizations reported these violations and abuse to the New Orleans ICE Field Office Director, CRCL, and DHS OIG on October 7, 2020, called for an emergency investigation and immediate stay of deportation. The organizations also requested videos, forms, and reports about the incidents.

77.     Six asylum seekers also reported physical abuse and threats of such abuse related to signing deportation documents in Jackson Parish in October 2020, including CM.[17] Human rights organizations submitted their detailed allegations in a complaint with CRCL and DHS OIG on November 5, 2020, calling for an immediate halt to their deportations and investigation.

78.     Many of the Cameroonian individuals who suffered the harm detailed in these three separate complaints and participated in the complaints against ICE and DHS were the same individuals scheduled for deportation on the flights on October 13 and November 11, 2020.

---

[16] Freedom for Immigrants et al, *Immigration and Customs Enforcement Officers' Use of Torture to Coerce Immigrants Into Signing Immigration Documents at Adams County Correctional Facility* (Oct. 7, 2020), https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5f7f17f39e044f47175204fb/1602164723244/Re+CRCL+Complaint+ICE%27s+Use+of+Torture+to+Coerce+Immigrants+to+Sign+Immigration+Documents+at+Adams+County+Correctional+Facility.pdf.

[17] Freedom for Immigrants et al., *U.S. Immigration and Customs Enforcement (ICE)'s Pattern of Torture in Signing of Deportation Documents for Cameroonian Migrants* (Nov. 5, 2020), https://www.splcenter.org/sites/default/files/crcl_complaint_ice_s_pattern_of_torture_in_signing_of_deportation_documents_for_cameroonian_migrants.pdf

79.      Members of the U.S. Congress also became involved in trying to stop the deportation flights. Representative Bennie Thompson, Chairman of the House Committee on Homeland Security, and Representative Karen Bass, Chairwoman of the Congressional Black Caucus, sent a letter to ICE on October 13, 2020, urging ICE to stop the October 13 deportation flight.[18] The letter cites the complaint detailing abuse and concerns with travel documents reported by the Cameroonians detained at Adams County and urges ICE to halt the removal of the 200 Cameroonians slated for removal until an investigation into the troubling complaint allegations was complete.

80.      Representatives Ilhan Omar, Cedric Richmond, and Joaquin Castro also sent a letter on October 13 raising concerns both about the treatment of Cameroonians in detention and the danger they would face after deportation in Cameroon, and asked ICE to respond to a set of questions about ICE's treatment of Cameroonian migrants.[19]

81.      Senators Chris Van Hollen, Ed Markey, Chris Coons, and Ben Cardin also sent a letter urging ICE to stop the November deportation flight.[20]

82.       The Congressional Black Caucus also sent a letter to DHS on November 10, 2020, expressing their concerns about the imminent deportation of Cameroonians seeking asylum. The Caucus also urged DHS to stop the deportation flights because of the violence and human rights abuses occurring in Cameroon. Additionally, the Caucus reiterated the danger these

---

[18] Congressional Black Caucus Letter to ICE (Oct. 13, 2020), https://cbc.house.gov/uploadedfiles/2020-10-13_t_dhs_ice_-_cameroonian_asylum_seekers.pdf.
[19] Congressional Letter to ICE (Oct. 13, 2020), https://omar.house.gov/media/press-releases/reps-omar-richmond-castro-lead-letter-condemn-treatment-cameroonian-migrants
[20] Senate Letter to DHS (Oct. 28, 2020), https://www. vanhollen.senate.gov/news/press-releases/van-hollen-colleagues-call-on-trump-administration-to-halt-deportation-of-cameroonian-asylum-seekers

Cameroonians would face once they arrived back in Cameroon, including the imminent risk of death.[21]

83.    DHS received these letters of concern and continued with the deportation flights on October 13 and November 11, 2020.

84.    ICE officials in Washington, D.C. planned and coordinated the October 13 and November 11, 2020 flights and staging flights from other detention centers, including by coordinating flight logistics and arranging for photo and video documentation.

85.    ICE officials in Washington, D.C. communicated with State Department officials about the October 13 and November 11, 2020 flights.

86.    ICE public affairs officials in Washington, D.C. received and responded to press inquiries regarding the October 13 and November 10, 2020 removal flights in advance of the flights, the days of the flights, and following the flights.

87.    ICE public affairs officials in Washington, D.C. monitored press coverage and social media communications from advocacy groups in the lead up to and during the October 13 and November 10, 2020 removal flights.

88.    ICE designated both the October 13 and November 11 flights as "Special High Risk Charter" flights. According to the ICE Air Handbook, such flights are "to remove Failure to Comply (FTC) and significant High Profile Removals (HPRs) from the United States." This designation placed a SWAT team of officers on the deportation flights whose practices

---

[21] Congressional Black Caucus Letter to DHS (Nov. 10, 2020), https://www.dhs.gov/sites/default/files/2023-05/Jun%20%2801%29_Stop-Deportation-Flight-to-Cameroon.pdf

included routinely laying out The WRAP restraints and using them as a threat to those being deported, as documented and pictured in detail below.[22]

89.    Although aware of the previously stated violations, allegations, and risk of danger, DHS and ICE planned to deport KNN and EU on October 13, 2020. Shortly before the plane took off, KNN and EU were removed from the plane, but they were not told why.

90.    RN was deported on the October 13, 2020, flight back to Cameroon.

91.    On November 11, 2020, KNN, CM, and EU were transported to Fort Worth Alliance Airport. KNN and CM were deported to Cameroon.

92.    EU was removed from the flight once again after suffering severe chest pain while ICE kept him tied up in The WRAP. EU was treated in an ambulance and then transported back to the Prairieland Detention Center.

### C. Use of Force and Threats In the Days Prior to Deportation Flights

#### i. KNN

93.    KNN was not told he was being deported in the days prior to October 13, 2020. His appeal was still pending with the Fifth Circuit. He was given a medical examination and taken to Jena, Louisiana, where he was told they would be leaving shortly, but he did not know where he was going, which terrified him.

94.    When ICE officers came to transport them, he and others in custody demanded to know where they were being taken. The warden told them, "If you don't comply, we'll try our own methods."

---

[22] *See infra* II.E.i; DHS ICE Budget Overview, FY 2020 Congressional Justification at 134, https://www.dhs.gov/sites/default/files/publications/19_0318_MGMT_CBJ-Immigration-Customs-Enforcement_0.pdf.

95.    KNN asked to speak to an ICE deportation officer. The warden left and returned with a huge group that separated KNN and the others detained with him. Seven or eight agents pushed him to the floor and pinned him there, shackling him. He was then told by ICE officers that if he did not cooperate with them, they would use their own methods.

96.    He and others were taken to Alexandria Staging Facility, an airport and ICE detention center in Louisiana, and later to the Prairieland Detention Center in Texas.

### ii.  RN

97.    While RN was detained at Adams County in 2020, detainees in a different dorm there went on hunger strike.[23] RN saw an ICE officer carrying a large gun and heard what sounded like a gunshot. He felt very fearful.

98.    In September 2020, ICE began the process of trying to deport RN on the October 2020 flight. RN refused to sign his deportation papers because he feared what would happen if he were deported to Cameroon. A group of officers at Adams County overpowered him. They held him down, grabbed his hand, pressed it down to the point where he felt that his fingers would break, and forcibly took his fingerprints.

99.    Eight other Cameroonians reported similar treatment at Adams County in a complaint filed with ICE, the DHS Office of Civil Rights and Civil Liberties (CRCL), and the DHS Office of Inspector General.[24]

---

[23] U.S. Immig. & Customs Enf't., Significant Incident Summary (SIS), Adams County Correctional Center 4-5 (indicating that hunger strikes occurred at Adams County Correction Center in February, March, April, May, October, and November 2020), https://www.ice.gov/doclib/facilityInspections/adamsCoCorrCntr_SIS_12-03-2020.pdf. The report also notes one incident involving use of force with a chemical agent in September 2020, as well as three immediate use of force incidents in September 2020. *Id. at* 4.
[24] Southern Poverty Law Center & Freedom for Immigrants, *Immigration and Customs Enforcement Officers' Use of Torture to Coerce Immigrants Into Signing Immigration Documents at Adams County Correctional Facility* (Oct. 7, 2020) https://static1.squarespace.com/static/5a33042eb078691c386e7bce/t/5f7f17f39e044f47175204fb/1602164723244/R

100.    RN was transferred to the Alexandria Staging Facility in Alexandria, Louisiana. From there, he was transferred to the Prairieland Detention Center.

### iii.  **CM**

101.    At Jackson Parish, CM's fingerprints were taken by force to facilitate his deportation.

102.    An ICE officer insisted he sign the documents, but CM refused, noting that he had a pending motion to reopen and that he would be signing a death sentence. The officer told him to provide his fingerprint instead, saying that it would not be equivalent to signing and that CM would still have to sign in order to be deported. CM still refused.

103.    The ICE officer then called other ICE officers and detention officers to come over. One ICE officer handcuffed CM's left wrist and pulled hard while other ICE and detention officers held him from behind. CM thought his arm was going to be ripped off his body. Two other officers, including an ICE officer, pried open the fingers of his right hand, which he had been holding in a tight fist. An officer pressed his right index finger onto a wet pad, then onto dry paper.

104.    CM reported this incident to human rights organizations to pass along to oversight bodies and congressional representatives, and he was one of the witnesses in the complaint filed with the DHS Office of Inspector General and CRCL about the misuse of force in forcing his fingerprinting at Adams County.[25]

105.    After his fingerprints were forcibly taken, he was taken to Alexandria, Louisiana. From there, he was transferred to the Prairieland Detention Center.

**D.  Unlawful Use of Force and Unlawful Use of The WRAP Restraint Device**

e+CRCL+Complaint+ICE%27s+Use+of+Torture+to+Coerce+Immigrants+to+Sign+Immigration+Documents+at+A
dams+County+Correctional+Facility.pdf.
[25] Freedom for Immigrants et al., *supra* note 17.

106.     Each of the four Plaintiffs was tied up by ICE officers using The WRAP device while ICE was transporting them, in violation of ICE standards as well as manufacturer guidelines.

### i.  KNN

107.     On October 13, KNN was taken with others to the Fort Worth Alliance Airport. He saw EU immobilized by a restraint he later learned was called The WRAP and placed in a hood.

108.     Both KNN and EU were removed from the flight at the last minute without explanation.

109.     KNN was held in isolation for approximately two weeks with only a bed and a toilet—no natural light, no books, and nothing to do.

110.     He had an interview scheduled to apply for asylum in Canada on October 30, 2020, across the border from Buffalo, New York, and had a Canadian lawyer representing him. But ICE refused to transport him to the interview.

111.     KNN was told by facility officers at Prairieland that he was being deported on the morning of November 11, 2020. He was shocked to learn he was being deported. KNN initially resisted being shackled for the purposes of deportation and asked to first discuss the situation with an ICE officer because he had an appeal of his deportation order pending at the U.S. Court of Appeals for the Fifth Circuit.

112.     The facility officers left and returned, telling KNN he was right, and that he would not be deported because he was a "special case." KNN went with them, but they took him into isolation and tried to shackle him there. A group of around eight or ten ICE officers entered

the cell and immediately shot his legs several times with rubber bullets: two hit his left thigh and two hit his right shin.

113.    After the ICE officers shot KNN multiple times with rubber bullets, they threw him down and pushed his face into the ground. ICE officers held his arms and legs together while KNN was being pinned face-down on the ground. KNN was shackled with five-point restraints[26] and then bound in The WRAP.

114.    The ICE officers also connected his chest to his feet with an additional strap. The ICE officers leaned on KNN's back, pushed his face toward his knees, and pulled the strap tight. This trapped KNN's body at an acute angle, approximately 40 degrees, that left him completely immobile. This position was excruciatingly painful, especially in light of the back injury KNN sustained in Cameroon that still caused him pain. The handcuffs used on KNN were fastened so tightly that they cut into his skin, causing open sores and leaving bruises.

115.     As noted above, KNN suffered from gastrointestinal bleeding and severe back pain. Both of these conditions are likely to be exacerbated by an assault with rubber bullets and use of The WRAP. However, upon information and belief, ICE did not conduct such a health assessment before shooting KNN multiple times with rubber bullets and placing him in The WRAP. Nor did ICE provide KNN with medical care following this calculated use of force.

116.    KNN was placed in The WRAP by ICE officers at approximately 10:30 a.m. on November 11, 2022. Four to six ICE officers carried KNN out of the facility at Prairieland onto a bus that brought KNN to Alliance Airport in Fort Worth, Texas. When KNN was at the airport, he pleaded several times that he needed to use the restroom, however, no ICE officers removed KNN from The WRAP or otherwise allowed him to access a bathroom.

---

[26] Five-point restraints refers to handcuffs and leg irons connected to a waist chain.

117.     ICE officers then carried KNN onto the plane, still in The WRAP, and did not remove his restraints. KNN remained in The WRAP for many hours.  KNN was not under any medical supervision for the lengthy duration of his time in The WRAP. KNN was placed in The WRAP and was restrained despite no indication that he posed a risk to himself or others on board.

118.     While KNN remained in The WRAP for hours during the flight, he repeatedly cried out in pain, asking to be let out of The WRAP so he could use the restroom. Eventually, ICE officers let him out of The WRAP. As they took him out of The WRAP, an ICE officer told him not to "try any shit" or else they would put him back in The WRAP. KNN remained shackled until he landed in Cameroon.

119.     KNN was detained by the Cameroonian authorities upon arrival in Douala. While in detention in Cameroon, KNN was not allowed access to soap or water to clean the open wounds he incurred from ICE's use of handcuffs on the deportation flight. His wounds became infected as a result. Being immobilized at a 40-degree angle in The WRAP caused immense stress on his body. ICE's use of The WRAP exacerbated the back injuries KNN suffered in Cameroon.

### ii.  RN

120.     The day that RN was transferred from Adams County to the Alexandria Staging Facility in Louisiana, around two dozen ICE officers arrived at Adams County. RN saw one of them carrying a large gun. They loaded RN and other African detainees on a bus, stopped at the LaSalle Detention Facility in Jena, Louisiana, to collect more Cameroonians and other Africans, and the continued to Alexandria. RN spent a couple days at the Alexandria Staging Facility in a small, two-person cell. Early one morning, ICE agents came to his cell and placed him in five-

point restraints. He was left shackled in his cell for hours and grew increasingly more anxious. RN begged not to be deported back to Cameroon because he feared being killed there.

121.    Four officers came into RN's cell and threw him to the ground. Since RN was already restrained when the officers threw him to the ground, and he did not pose a threat to himself or others.

122.    The four officers carried RN outside, where another ICE officer joined them. RN was still shaking from being thrown, when one officer put his knee on RN's neck while other officers tied him up in The WRAP.  The WRAP was placed on top of the five-point restraints. RN was tied so tightly and was in so much pain that he started to cry. The officers then attached a cord from his chest to his feet and pulled his upper body down so his face was close to his knees. RN told the officers that he couldn't breathe but they just told him to stay calm. ICE agents improperly and negligently used The WRAP to pull RN's head towards his legs at approximately a forty-five-degree angle in a stress position. The pain in RN's knees and feet was excruciating.

123.    RN was left outside in The WRAP for at least one hour. He believes that he was left there on display to deter others from protesting their deportation. He was left on the ground, crying in pain, until everyone was loaded onto the plane. When the ICE officers finally removed The WRAP, they threatened to put it back on RN again if he didn't remain calm. Two ICE officers held him by the shoulders and shoved him onto the plane.

124.    Upon information and belief, RN's medical conditions, including his preexisting pain in his joints, feet, and back, were not taken into consideration before RN was placed in The WRAP. RN experienced significant physical and psychological harm as a result of ICE's conduct.

### iii.  **CM**

125.     On November 11, 2020, CM was transported by ICE from Prairieland to Fort Worth Alliance Airport for a deportation flight to Cameroon.

126.      When CM was on the tarmac at the airport, he began to feel weak. While walking to the plane, CM tripped and fell. ICE officers immediately dragged him across the tarmac, climbed on top of him, and restrained him in The WRAP. The ICE officers applied The WRAP on top of CM's five-point restraints. CM had not been resisting the ICE officers prior to their application of The WRAP.  CM had done nothing to indicate that he would not willingly cooperate to board the plane.

127.     The ICE officers attached a strap to connect CM's lower legs to his chest at less than a 90-degree angle, holding CM in a stress position akin to a fetal position. This position caused CM excruciating pain in his waist and back. The ICE officers' improper application of The WRAP also compressed CM's lungs in such a way that it was extremely difficult for him to breathe, which exacerbated his underlying asthma. While in The WRAP, CM believed that he would die from a lack of oxygen.

128.      After CM was placed in The WRAP, approximately six officers picked him up and carried him onto the plane.  On the plane, the ICE officers placed CM in the center of a row of seats, where he was left for nearly four hours. During this time, CM experienced severe back pain and could barely breathe.

129.     Eventually, someone who appeared to be a doctor came to check on CM. CM begged to be taken out of The WRAP but the doctor only reached into CM's pocket to get out his inhaler.  He put the inhaler to CM's mouth so he could take a breath and then tossed it on the seat next to CM and walked away. Although this incident demonstrates that ICE was aware that CM

required the use of an inhaler, his medical conditions were not taken into account before he was placed in The WRAP or during his time restrained in The WRAP, when he was almost completely unable to breathe. The medical assistance provided to CM was neither timely nor adequate, as CM was only allowed one draw on his inhaler after nearly four hours of acute physical and mental distress.

130.     While on the plane in The WRAP, CM saw two other men on the plane in WRAPs and could hear them crying. CM heard others on the plane shouting for help, to which the ICE officers did not respond.

131.     When CM begged an ICE officer to loosen his WRAP, the officer pulled The WRAP tighter. ICE officers did not remove The WRAP until the plane reached cruising altitude.

132.     In total, CM was in The WRAP for approximately four hours, during which time he experienced significant physical pain and emotional suffering. CM continues to experience lasting physical pain from the way and duration for which he was restrained in The WRAP. To this day, CM cannot perform heavy lifting and undergoes physiotherapy for pain in his waist and back. When CM cannot afford to see a physical therapist, he has to rely on over-the-counter pain medication and stretches to ease his pain.

### iv.  EU

133.     In October 2020, EU was transferred from Etowah County Detention Center in Gadsden, Alabama, to the LaSalle Detention Facility in Jena, Louisiana, to the Prairieland Detention Center in Alvarado, Texas. On October 13, 2020, he was taken on a bus from Prairieland to the Fort Worth Alliance Airport for deportation. When he arrived at the airport, he saw multiple WRAP restraints laid out on the ground. He heard others who were detained calling The WRAP the "tortilla."

134.    EU told ICE officers that his appeal was still pending with the U.S. Court of Appeals for the Fifth Circuit and that he had a pending motion to reopen with the BIA. He also expressed his fear of persecution in Cameroon.

135.    Even though he was already in five-point shackles, the ICE officers tied him up in The WRAP and forced him onto the plane. The cord connecting his legs to his chest was pulled tight to a 45-degree angle, and he couldn't move.

136.    In addition, the ICE officers improperly put a hood over his head with netting across his face. He felt immobilized and terrified. His heart was pounding, and he felt like he couldn't breathe. EU felt pain all over his body. No one asked him about his medical conditions or indicated any awareness of them before placing him in The WRAP.

137.    He was carried onto the plane in The WRAP. He didn't know if or when the officers planned to take it off. No one checked on his medical condition. EU spent the entire time onboard the plane in The WRAP.

138.    Shortly before take-off, EU was removed from the October 2020 flight. He does not know why he was removed, but Congressional representatives had advocated for EU to be removed from the flight. He does not know how long he was in The WRAP before being taken off the flight.

139.    He was subsequently transferred back to La Salle Correctional Facility in Louisiana and then to Etowah in Alabama. EU did not receive medical care after being pulled from the flight.

140.    ICE tried to deport EU a second time on November 13, 2020. Once again, ICE transferred him from Etowah in Alabama to La Salle in Louisiana, to Prairieland in Texas, then took him to the Fort Worth Alliance Airport.

141.     When he arrived at the airport, he again saw WRAP restraints laid out on the ground. He believes that The WRAPs were displayed to scare detainees and warn them about what would happen if they protested.

142.     Terrified of being killed in Cameroon, EU begged the ICE officers not to deport him. Several officers surrounded him and tied him up again in The WRAP, applying it over his five-point shackles. A hood was placed over his head like before and he was carried onto the plane. EU's arms and legs were tied up again, and he was bent in half close to a 45-degree angle. EU was then carried onto the plane in The WRAP.

143.     On the plane, EU saw KNN, who was also tied up in The WRAP. When the officers opened some of the overhead compartments on the plane, he saw that they had more WRAPs stored up there.

144.     EU had no idea how long he would be left in The WRAP. He was in pain and very frightened about the prospect of spending more hours tied up in that position. He felt panicked, anxious, and claustrophobic.  He started having heart palpitations and severe chest pain.

145.     Fearful that he was having another heart attack, EU shouted for help. Eventually, a doctor or nurse came onto the plane and told ICE to take EU off the flight. After ICE removed him from the plane and took off The WRAP, EU was treated in an ambulance at the airport.

146.     EU asked to be taken to the hospital for medical care because he wanted to have his heart properly examined. He was still having trouble breathing and felt weak and dizzy. Instead, ICE officers took him straight back to Prairieland Detention Center. He did not receive any medical care at Prairieland. He was then transferred back to Louisiana and Alabama.

147.     Being placed on two deportation flights in The WRAP were terrifying and dehumanizing experiences for EU. His experience in The WRAP exacerbated his depression.

**E.  DHS And ICE Officials Violated Plaintiffs' Rights by Disregarding ICE's Policy on Use of Force and Restraints and Safe Use Guidelines for The WRAP.**

### i.  The WRAP

148.     The WRAP is manufactured by California-based Safe Restraints, Inc.

149.     ICE authorized use of The WRAP as "the only authorized soft restraint device" in late 2017 and removed the previously-used "Humane Restraint Blanket" from the list of restraint devices.[27]

150.     The WRAP is designed to restrain individuals at a ninety-degree upright angle. The individual should be placed "comfortably in an upright and seated position."[28]

151.     The WRAP is designed to be used as a restraint on its own or with handcuffs only, not with five-point restraints.[29]

152.     The application manual for The WRAP clearly states that "[u]pon immediate application of The WRAP, the subject should be assessed for any safety, comfort and/or medical considerations," and notes that chest pains and emotional distress are symptoms for which immediate medical care should be sought.[30]

153.     Sample policies for The WRAP from Safe Restraints indicate, "THE SUBJECT SHOULD NOT BE LEFT UNATTENDED."[31]

---

[27] https://govtribe.com/opportunity/federal-contract-opportunity/wrap-restraint-system-sole-source-justification-192118iaowraps122.
[28] Safe Restraints, Inc., *The Wrap Safety Restraint*, https://www.saferestraints.com/the-wrap-safety-restraint.
[29] 2014 Manual, *supra* note 10 at 10.
[30] Safe Restraints, Inc. *'The Wrap' Application Manual* (Nov. 2020), https://web.archive.org/web/20211029194853/https://www.saferestraints.com/wp-content/uploads/2021/02/The-WRAP-Safety-Restraint-Application-Manual-2020.pdf
[31] https://www.aele.org/law/2008ALL12/wrap.pdf

154.    ICE used The WRAP as a threat to those being transported on flights, especially on flights they categorized as "Special High Risk Charters."

155.    Documentary video footage taken by individuals given "exclusive access to ICE/ERO during the last year of Trump's presidency" show another flight classified as a Special High Risk Charter to West Africa.[32] Officers laid out The WRAP for all individuals on the flight, as still footage captured from the documentary shows.





---

[32] Beyond Borders, *World's Toughest Border Patrol*, YOUTUBE (May 22, 2022) https://www.youtube.com/watch?v=neHKavfACeo; Beyond Borders, *Deported to West Africa via Private Jet*, FACEBOOK (Jun. 2, 2022) https://www.facebook.com/watch/?v=965745807433961.

ICE officers put the top portion of the WRAP on each person being deported,



and loaded one person onto the plane in The WRAP.



## ii. Use of Force and Restraints Requirements

156.     Officers violated binding law and policies and disregarded manufacturer guidance in their use of The WRAP on Plaintiffs.

157.     The U.N. Committee Against Torture recognizes that "positional abuse when handcuffed or bound" is a form of torture.[33]  Both the Special Rapporteur on Torture and the

---

[33] Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Manfred Nowak: Mission to Sri Lanka, General Assembly, Human Rights Council, 7th Session, U.N. Doc. A/HRC/7/3/Add.6 (2008); *see also Aksoy v. Turkey* 23 Eur. H.R. Rep. 553 (1997).

Committee against Torture have condemned methods of restraint that are inherently inhuman, degrading, or painful, or have such effects.[34]

158.     The U.S. Supreme Court has also found that restraining individuals in stress positions violates the Eighth Amendment's guarantee against cruel and unusual punishment, and that state actors had fair warning that conduct including "forcing inmates to . . . maintain awkward positions for prolonged periods" violated the Constitution.[35]

159.     Prairieland Detention Center, Adams County Detention Center, and Jackson Parish Correctional Center all operate under ICE's 2011 Performance Based National Detention Standards ("PBNDS 2011"). ICE's Office of Detention Oversight also reviews the Alexandria Staging Facility under the PBNDS 2011 (2013 Errata).[36]

160.     ICE's policy on the Use of Force and Restraints (the "Force Policy"), issued as part of the PBNDS 2011, states that staff shall attempt to gain the detainee's willing cooperation before using force. ICE officers did not attempt to secure Plaintiffs' willing cooperation before they violently restrained plaintiffs with The WRAP.

161.     The Force Policy further states that "staff may immediately use restraints, if warranted, to prevent a detainee from harming self or others or from causing serious property damage,"[37] and officers "shall use only the degree of force necessary to gain control of the

---

[34] U.N. Comm. Against Torture, Report of the Committee Against Torture, 23rd/24th Session, ¶ 180(c), U.N. Doc. A/55/44 (2000); *see also* Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, General Assembly, 68th Session, ¶ 58, U.N. Doc. A/68/295 (2013).

[35] *Hope v. Pelzer*, 536 U.S. 730, 742 (2002).

[36] Off. of Det. Oversight, U.S. Dep't of Homeland Sec., *Compliance Inspection of the Alexandria Staging Facility* (Aug. 2-4, 2022) https://www.ice.gov/doclib/foia/odo-compliance-inspections/alexandriaStagingFacAlexandriaLA_Aug2-4_2022.pdf.

[37] Immigr. & Customs Enf'r, U.S. Dep't of Homeland Sec., *2011 Operations Manual ICE Performance-Based National Detention Standards*, (2011) at 202 [hereinafter Force Policy].

detainee."[38] Plaintiffs posed no risk to themselves or others, or to any surrounding property, when ICE put them into The WRAP, in contravention of the Force Policy.

162.    According to the Force Policy, "[r]estraints shall be applied for the least amount of time necessary to achieve the desired behavioral objectives."[39] Plaintiffs were kept in The WRAP for hours, long after there was any need for them to be restrained and despite their compliance with ICE officers.

163.    The Force Policy prohibits the use of restraints "[t]o cause physical pain or extreme discomfort."[40] It stresses that "[u]nder no circumstances shall staff use force or apply restraints to punish a detainee."[41]

164.    The use of The WRAP on Plaintiffs was in contravention of this policy. ICE agents improperly and negligently used the WRAP to pull plaintiffs' chests toward their legs at a forty-five-degree angle, instead of the ninety-degree upright angle intended by the manufacturer.

165.    ICE's application of the restraints was unnecessarily tight and were improperly applied over leg shackles and a waist chain, which are not utilized in any Safe Restraints guidance and apply multiple levels of restraints that cause unnecessary harm.

166.    The Force Policy stresses that any "[d]eviations" from th[e] list of [approved] restraint equipment are strictly prohibited."[42] In addition to the improper modifications from normal use of The WRAP noted above, in EU's case, The WRAP was improperly modified by adding a hood.

---

[38] *Id.* at 200.
[39] *Id.* at 202.
[40] *Id.* at 202.
[41] *Id.* at 202.
[42] *Id.* at 209.

167.     Additionally, the Force Policy strictly prohibits the use of restraint equipment or devices "on a detainee's neck or face, or in any manner that restricts blood circulation or obstructs the detainee's airways (e.g., mouth, nose, neck, esophagus)."[43] Unnecessarily tight application of The WRAP on Plaintiffs obstructed or risked obstructing their airways by constricting their lungs. Application of the netted hood on EU may have further obstructed his airways.

168.     For detainees with special medical or mental health needs, the Force Policy states that "the appropriate medical or mental health staff shall be consulted prior to the calculated use of force."[44] A calculated use of force must be authorized in advance and requires medical staff to first review the detainee's medical file "for a disease or condition that an intermediate force weapon could seriously exacerbate, including, but not limited to, asthma, emphysema, bronchitis, tuberculosis, obstructive pulmonary disease, angina pectoris, cardiac myopathy, or congestive heart failure."[45] On information and belief, no such medical assessment was done for each of the Plaintiffs before using The WRAP or, in the case of KNN, before shooting him with rubber bullets.

169.     Instead, ICE officers applied The WRAP even though, under binding policies, each Plaintiff should have had their medical summary accompanying them during the transit.[46] ICE knew about medical conditions making use of The WRAP inappropriate—including KNN's gastrointestinal bleeding, hypertension, back pain, and depression; RN's depression, anxiety, chest pain, and sciatica, and pain on his feet; CM's asthma; and EU's coronary heart disease, stent, depression, gastrointestinal reflux, and hypertension.

---

[43] *Id.* at 202.
[44] *Id.* at 205.
[45] *Id.* at 205.
[46] Immigr. & Customs Enf'r, U.S. Dep't of Homeland Sec., *ICE Air Operations Handbook* at 11 (citation omitted).

170.    When there is an "immediate-use-of-force" situation, "staff shall seek the assistance of qualified health personnel to immediately" determine if the detainee needs continuing care, examine the detainee, and provide any necessary medical services.[47] No such examination was made for each of the Plaintiffs, except when a doctor or nurse was consulted the second time EU was placed in The WRAP and determined that he should be removed from the plane.

171.    Furthermore, an email from ICE spokesperson Mary G. Houtmann, dated December 14, 2020, stated that The WRAP was to be used "[o]nly during the instances when a deportee on an ICE Air flight becomes non-compliant, poses a risk to himself and/or others onboard the flight . . . for the safety and security of all onboard the aircraft." On information and belief, subjecting Plaintiffs to The WRAP in the detention center and in boarding the plane violated ICE policies regarding use of The WRAP.

172.    The Force Policy also states that physical force "shall only be used, when both necessary and reasonable," and "to the minimum extent necessary to restore order, protect safety, and provide security."[48] Plaintiffs RN and CM were improperly subject to physical force by ICE officers when they demanded Plaintiffs sign deportation documents without any explanation and then used extreme physical force to obtain Plaintiffs' fingerprints against their will.

173.    Plaintiffs raised these issues about ICE's abuse in using The WRAP and failure to follow its own policies in a complaint to CRCL filed on October 13, 2021.[49] They submitted evidence, testimony, and interviews as part of that process. To date, Plaintiffs have not received

---

[47] Force Policy, *supra* note 38 at 206.

[48] *Id.* at 200.

[49] Complaint Regarding ICE's Use of The WRAP as a Restraint Device, Submitted to DHS Office for Civil Rights and Civil Liberties, Oct. 13, 2021, https://static1.squarespace.com/static/5701c3253c44d887e796b6e2/t/6166d47647aa3a692d4b1be0/1634129028823/CRCL+Complaint+Regarding+The+WRAP_Final.pdf.

any indication of a resolution or change to ICE's policies as a result of CRCL's investigation into The WRAP.

### F.    Defendants DHS and ICE's Pattern of Unnecessary Use of Force

174.    DHS and ICE agents' use of The WRAP during the 2020 deportation flights reflects a pattern and practice of DHS and ICE agents improperly using force and restraint devices and ignoring signs of pain and suffering.

175.    DHS and ICE have historically sought to avoid disclosure of internal investigations of abuse, including by CRCL. However, some information has been made public. In response to a FOIA lawsuit successfully brought by NPR, NPR received reports from experts engaged by CRCL to explore allegations of abuse and other harmful and inappropriate conduct occurring in ICE facilities.[50]  These reports detailed "'negligent' medical care (including mental health care), 'unsafe and filthy' conditions, racist abuse of detainees, inappropriate pepper-spraying of mentally ill detainees and other problems that, in some cases, contributed to detainee deaths."[51]

176.    For instance, one report obtained by NPR detailed an incident at the Etowah County Jail in 2017. The investigator found that, during this incident, an officer tased a Nigerian detainee during an interaction at the top of a staircase. The detainee suffered a serious head injury and was rendered unconscious. Despite the detainee's unconscious state, the officer yelled at the detainee to move. When the detainee could not satisfy the officer's demands, the officer threatened to tase the detainee again. The officer then moved the detainee. According to the investigator, moving the detainee could have caused serious permanent neck or spine injury. The investigator found that, while use of the taser was initially appropriate, the officer did not deploy the taser

---

[50] Tom Dreisbach, *supra* note 5.
[51] *Id.*

according to ICE policy and placed the detainee in danger. ICE discontinued use of Etowah in 2022 due to "... a long history of serious deficiencies identified during facility inspections . . .."[52]

177.    Others have gathered information regarding treatment on ICE Air deportation flights.  On April 3, 2016, ICE deported 85 Bangladeshis, Nepalis, and Indians on an ICE charter flight. During interviews with The Guardian, individuals on those flights reported that ICE used "body bags" (believed to be the restraint blankets similar to The WRAP employed by ICE at the time). ICE agents reportedly pinned people to the ground, forced them into the tightly fastened blankets, and carried people onto the plane. Others reported that ICE used tasers to force compliance. People on this flight stated that ICE's use of force left many with visible signs of injury. ICE admitted to using "minimal force," including the restraint blankets. [53]

178.    Through a comprehensive review of data obtained through FOIA requests, online research, and interviews with immigrants and their families, local officials, and ICE employees, among others, the University of Washington's Center for Human Rights (UWCHR) also issued findings about ICE Air and removal proceedings.

179.    Through a FOIA request, UWCHR received a 58-page document containing allegations of abuse between September 2007 and January 2019.[54] This document included 99 different complaints, including allegations of inappropriate conduct that occurred during or in connection with ICE Air and removal flights. Individuals accusing ICE of abuse filed complaints with CRCL. In response to a FOIA request for documentation concerning any investigations into

---

[52] Etowah, *supra* note 12.
[53] Aviva Stahl, *South Asian Migrants Say They Were Put in 'Body Bags' for Deportation from Us*, THE GUARDIAN (May 27, 2016), https://www.theguardian.com/us-news/2016/may/27/south-asian-migrants-body-bags-deportation-us.
[54] Dep't of Homeland Sec., ICE Matters with Flights in the Summary (2019), https://jsis.washington.edu/humanrights/wp-content/uploads/sites/22/2019/08/2019-HQFO-00350.pdf.

ICE Air Operations and removal flights from 2010 to 2019, ICE reported that no records of that kind exist.

180.    Though ICE told UWCHR documentation of investigations into these allegations did not exist, CRCL received a report on November 9, 2016, from a detainee alleging assault by an ICE officer. While on a flight from Miami to New Orleans for transfer to the LaSalle Detention Facility in Louisiana, the detainee reported falling asleep on the flight while the seatbelt sign was off. The detainee claimed ICE agents woke him up while trying to put his seatbelt on. According to the detainee, an ICE agent and the detainee yelled at each other. The ICE agent then struck the detainee multiple times in the face. The ICE agent allegedly caused the detainee to suffer a black eye.

181.    On June 2, 2017, CRCL received a complaint alleging that, while on a flight from Louisiana to Arizona, an officer choked a detainee after the detainee requested food. On the same flight, the complainant alleged an officer purposefully tripped a handcuffed detainee. Detainees reported these actions once they arrived in Arizona, but the officers refused to acknowledge the incidents occurred.

182.    On May 23, 2018, CRCL received a complaint from a detainee at Prairieland Detention Center in Texas. The detainee alleged that many detainees being deported to Ghana were forced to spend the 14-hour flight in arm and leg shackles. When UWHCR received the document containing these complaints in 2019, the report indicated "More Information Needed" regarding this May 2018 complaint.

183.    On October 23, 2018, CRCL received a report from a complainant alleging that, when the complainant was being taken to the Columbus airport by two ICE officers, one of the officers told the complainant to leave the vehicle and began using his knees to kick the

complainant. The second ICE officer allegedly forced the man to the ground. During this incident, the man's forehead hit the pavement multiple times to the point where blood gushed out of his head. At the time UWCHR received this report, this October 2018 incident was labeled as "Under Investigation-non 504."

184.     These allegations demonstrate ICE's repeated use of inappropriate methods during detainment and deportation. ICE agents deployed similar tactics against Plaintiffs KNN, CM, EU, and RN during their detainment and against Plaintiffs KNN, CM, and RN during their deportation. ICE's inappropriate and unnecessary methods resulted in Plaintiffs' intense physical pain and emotional distress.

## G. ICE Denied Plaintiffs KNN, CM, and RN Access to Baggage, which Contained Documents Related to their Asylum Claims

185.     In addition to being unlawfully restrained, Plaintiffs were also denied access to their luggage bags in the hours and days before deportation. As a result, Plaintiffs KNN, CM, and RN were unable to remove sensitive asylum documents from their luggage.

186.     By failing to allow Plaintiffs access to their luggage to access and remove the asylum documents before handing over the luggage to the Cameroonian government upon arrival, ICE handed Plaintiffs' confidential asylum documents to the Cameroonian authorities in violation of DHS regulations and policy.

187.     In February 2022, Human Rights Watch released a report detailing the events surrounding the deportations of Cameroon asylum seekers back to Cameroon. The report documents that individuals were imprisoned, prosecuted, and forced into hiding because of their attempt to seek asylum, as Plaintiffs KNN, CM, and RN were.

### i.  KNN

188.      On October 30, 2020, KNN had a scheduled asylum hearing with the Canadian government. KNN was given his entire asylum file for the meeting. ICE did not transfer KNN to the location of his hearing and the hearing did not take place.

189.      Before the November deportation flight, ICE officers packed KNN's bags and did not allow him access. During this time KNN was placed in The WRAP at the detention center and then transported to the airport. The bags contained KNN's asylum file, which included KN's declaration that he had protested the Cameroonian government, had previously escaped from government authorities, and that KNN feared being jailed or killed if he returned to Cameroon. The file also contained information about KNN's residence in Cameroon.

190.      Upon arrival in Cameroon, KNN did not have access to his bags before ICE handed them to the Cameroonian authorities. Cameroonian authorities arrested KNN. KNN was brought to court where a Cameroonian government lawyer informed him that KNN's asylum file was sent to the court.

### ii.  CM

191.      Upon arrival at Prairieland Detention Center before the November 2020 flight, CM asked the guards for access to his bags so that he could destroy sensitive documents related to his asylum case. CM and other detainees protested for days to be allowed access to their bags so that they could remove the documents. They stood in front of the windows of their dormitories, shouting that they needed access to their bags and hitting the windows to get the guards' attention. The guards told CM that only ICE could give him access.

192.      The day before he was deported, CM and some other detainees were finally given limited, rushed access to their bags. The guards stood behind CM and the other detainees and told them to "hurry up and leave." Under pressure from the guards, CM was unable to find all

of his documents, including his asylum declaration and other sensitive information. CM saw some of the other detainees being denied any access to their bags. CM heard an ICE officer telling the detainees that they could access their bags at the Douala airport, but that did not happen.

### iii. RN

193.　　　When RN found out that he was being moved from Adams County Correctional Center in Mississippi, he did not know where he was going or that this transfer was a precursor to being deported back to Cameroon. RN had three bags with documents related to his asylum case, including a human rights report on Cameroon, the immigration judge's decision denying him asylum, and documents related to his appeals. When RN arrived at Prairieland Detention Center in Texas, he informed an ICE officer that he had important documents he needed to remove from his bags, but the ICE officer just responded that they would handle it.

194.　　　RN also told a facility officer at Prairieland that he needed to remove compromising documents from his luggage before going back to Cameroon. The officer told RN no.

195.　　　Eventually, ICE allowed RN access to only one of his three bags, but that bag did not contain the sensitive documents. RN never saw the other two bags before arriving in Cameroon.

### H. Upon Arrival in Cameroon, Plaintiffs KNN, CM, and RN Were Detained and Questioned by Cameroonian Authorities and Currently Fear for Their Lives.

### i. KNN

196.　　　On November 12th, KNN arrived in Douala, Cameroon. Cameroonian authorities searched through KNN's belongings, found his asylum documents, and immediately placed him under arrest.

197.    KNN was taken to Bonanjo Police Station in Douala along with three other asylum seekers who were deported on the same flight as KNN. KNN was able to call his sponsor in the U.S. and learned that his case was being watched by government authorities and that he would not be released until he appeared before a military court.

198.    Despite the ongoing COVID pandemic, authorities placed KNN in a crowded cell where social distancing was not feasible and there were no hand-washing facilities or masks made available. The cell was filthy, with no mattresses, forcing the plaintiff to sleep on the floor. In addition, the cell contained no toilet, and the detainees were only allowed plastic cups to relieve themselves. The unsanitary conditions of the jail and the inability to bathe subjected the plaintiff to rashes and insect bites. Due to ICE's use of tight restraints, KNN had open sores on his hands. Because there was no water provided for drinking or bathing, there was no way to keep his wounds clean, so they became infected. Cameroonian authorities did not feed the detainees, requiring KNN to rely on family visitors for food and water. In total, authorities detained KNN for twelve days.

199.    While in custody, KNN was interrogated by authorities and accused of being a part of the "Amba-boys," an armed separatists' group in the Anglophone regions. Although informed that he was under investigation, KNN was not informed what his charges were and was threatened with beatings by machete.

200.    After twelve days of detainment, KNN was taken to the Douala Military Court. The magistrate questioned KNN about who he was and the events leading up to KNN fleeing Cameroon. KNN lied to the magistrate because he feared that if he explained he had escaped and fled to seek asylum he would be investigated even more. KNN's family had to pay 1 million CFA, about $2,000, for his release.

201.    After payment, KNN was given a provisional release without receiving any paperwork or his identification. KNN was told he was still being investigated. Upon release, he immediately fled Cameroon.

202.    KNN lives in hiding in Nigeria. KNN still deals with the physical pain from the injuries sustained during removal and while fleeing Cameroonian authorities. He required intense physical therapy for his severe back pain. He is forced to spend most of his day lying or sitting down because of this pain. He cannot work due to these injuries.

203.    Because ICE failed to allow KNN to remove his sensitive asylum documents from his bags, resulting in his imprisonment and severe beatings by Cameroonian authorities, KNN continues to fear for his life and cannot return to Cameroon.

**ii.  CM**

204.    When CM arrived in Cameroon, his national ID card was confiscated. He saw Cameroonian authorities searching bags.

205.    Prior to his arrival in Cameroon, local police had seen CM's name on a scheduled deportation list and coerced his family into paying a bribe. They brought his mother to a police station in the Northwest region of Cameroon and threatened to jail CM if she did not make an "arrangement." CM's family paid a bribe of three million Central African francs (approximately $4,900) to police to ensure he was not detained or abused upon arriving in Cameroon.

206.    When he arrived in Cameroon in November 2020, CM was taken with some other deportees to a government facility for interrogation. Authorities asked how he had traveled to the U.S., why he was there, and why he had been deported.

207.    Because his family had paid a bribe, CM was released after being interrogated. But without his national ID card, he could not travel freely around the country due to numerous

government checkpoints. He risked being imprisoned or fined simply for not having his national ID with him. In Anglophone regions, those who may be accused of being separatist fighters.

208.     Fearing for his life in Cameroon, CM eventually fled to Ghana. He still fears of being found and harmed by the Cameroonian authorities.

### iii.  RN

209.     Upon arrival in Douala, Cameroonian officials immediately confiscated RN's teacher identification card, as well as another document with his picture on it. Those documents were submitted as part of RN's asylum package, since he had submitted evidence that he was persecuted for being a teacher involved in a protest. RN does not know if ICE officials gave these documents to Cameroonian authorities or if the Cameroonian authorities found the documents in his luggage.

210.     As a result, RN was detained for three days in a police station without any communication with the outside world. RN was never told what the charges were against him. RN was given food on the first day, but not on the second or third days. RN's only source of water while in custody was a dirty toilet. On the third night, a relative of another person who had been deported with RN helped the two of them escape from the police station.

211.     RN lived in Cameroon in hiding for a while. Fearful of being discovered and putting his family in danger, RN did not communicate with his relatives.

212.     RN eventually fled to Ghana, where he still lives in fear of the Cameroonian authorities.

## CLAIMS FOR RELIEF

## COUNT I: ABUSE OF PROCESS
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### (All Plaintiffs against Defendant United States)

213.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

214.    Under Alabama, Florida, Louisiana, Mississippi, Texas, and District of Columbia law, abuse of process occurs when an individual has an ulterior purpose and takes a willful action to use legal process in a manner that is not proper in the regular conduct of the proceeding.

215.    The federal employees, officials, and agents referenced above abused legal processes within their control for the unlawful purposes of traumatizing Plaintiffs KNN, CM, EU, and RN to abandon their lawful asylum, Convention Against Torture (CAT), parole, and custody review claims, and deterring future Cameroonian migrants from seeking refuge in the United States.

216.    Plaintiffs KNN, CM, EU, and RN were injured by Defendant's misconduct, including but not limited to Defendant's agents using unlawful force and unnecessary restraints against Plaintiffs KNN, CM, EU, and RN, and withholding medical treatment from Plaintiffs KNN, CM, EU, and RN.

217.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs KNN, CM, EU, and RN for abuse of process.

## COUNT II: NEGLIGENT SUPERVISION
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### (All Plaintiffs against Defendant United States)

218.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

219.    Under Louisiana, Texas, Mississippi, Alabama, and D.C. law, negligent supervision occurs when the defendant is negligent by breaching a duty of care owed to the plaintiff that proximately results in injury.

220.    Plaintiffs suffered damages from the foreseeable misconduct of federal employees and agents supervised by the defendant. The government's employees in supervisory roles have a duty to properly supervise detention officers and to oversee their treatment of immigrants in their custody.

221.    The blatant disregard for ICE's own internal policies and regulations, described above and demonstrated by Defendants' agents' behavior, includes but is not limited to:

    a.    Failing to care for Plaintiffs KNN, CM, EU, and RN in accordance with the Defendants' own Detention Standards and Use of Force Policy;

    b.    Failing to provide medical care to Plaintiffs KNN, CM, EU, and RN; and

    c.    Failing to exercise adequate care in restraining Plaintiffs KNN, CM, EU, and RN, including using unnecessary force and improperly applied restraints.

    d.    The actions listed above show that ICE and DHS staff were negligent in their non-discretionary duties to supervise individual officers. The government knew or should have known of these behaviors and nevertheless failed to adequately supervise the individual officers.

222.    The government's negligent supervision proximately caused the unlawful conduct described herein.

223.    As a proximate result of the failure to supervise, Plaintiffs KNN, CM, EU, and RN suffered severe pain, physical injury, and emotional distress.

224.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs KNN, CM, EU, and RN for negligent supervision.

## COUNT III: NEGLIGENCE
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### (All Plaintiffs against Defendant United States)

225.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

226.     In Louisiana, negligence occurs when: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the requisite duty of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injury; and (4) the risk, and the harm caused, was within the scope of protection afforded by the duty breached.

227.     In Texas, Mississippi, Florida, and Alabama, negligence occurs when: (1) the defendant owed a legal duty to the plaintiff; (2) the defendant breached that legal duty; and (3) the defendant's breach proximately caused the plaintiff's injuries.

228.     The federal employees, officials, and agents referenced above had a duty to Plaintiffs KNN, CM, EU, and RN to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

229.     Additionally, the federal employees, officials, and agents referenced above owed Plaintiffs KNN, CM, EU, and RN a heightened duty of care because, at all times relevant to this complaint, they had custody over Plaintiffs.

230.     Defendants engaged in the negligent and careless acts and/or omissions described in detail above, as well as additional acts, including, but not limited to:

a. Failing to care for Plaintiffs KNN, CM, EU, and RN in accordance with the ICE Detention Standards and the Force Policy;

b.  Failing to provide appropriate medical care to Plaintiffs KNN, CM, EU, and RN;

c.  Failing to exercise adequate care in restraining Plaintiffs KNN, CM, EU, and RN, including using force and leaving Plaintiffs in improperly applied restraints for hours at a time.

d.  As a direct and proximate result of Defendants' agents' negligent conduct, Plaintiffs KNN, CM, EU, and RN suffered substantial injuries, including but not limited to pain, physical injury, and emotional distress.

231.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs for negligence and negligent infliction of emotional distress.

## COUNT IV: BATTERY
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### (All Plaintiffs against Defendant United States)

232.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

233.    Under Louisiana, Texas, Mississippi, and Alabama law, a battery occurs when the defendant makes harmful or offensive contact with the plaintiff, resulting from an act intended to cause the plaintiff to suffer such contact.

234.    As detailed above, the federal employees, officials, and agents referenced above intentionally engaged in unlawful and unjustified harmful or offensive contact with Plaintiffs KNN, CM, EU, and RN by engaging in the following acts, which include, but are not limited to:

a.  Using unnecessary force and unnecessary restraints on Plaintiffs KNN, CM, EU, and RN while in detention; and

b.  Using unnecessary force and unnecessary restraints while placing Plaintiffs KNN, CM, and EU on deportation flights.

235.    As a direct and proximate result of Defendant's agents' harmful or offensive contact, Plaintiffs KNN, CM, EU, and RN suffered the injuries detailed above, including substantial physical injury resulting in lasting physical pain and lasting emotional distress.

236.    Under the Federal Tort Claims Act, the United States is liable to Plaintiffs KNN, CM, EU, and RN for battery.

## COUNT V: ASSAULT
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### (All Plaintiffs against Defendant United States)

237.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

238.    Under Louisiana, Texas, Mississippi, and Alabama law, assault is threat of battery.

239.    As detailed above, the federal employees, officials, and agents referenced above intentionally, knowingly, or recklessly threatened or caused harmful or offensive contact with Plaintiffs KNN, CM, EU, and RN by engaging in the following acts, which include, but are not limited to:

a.  Using unnecessary force and unnecessary restraints on Plaintiffs; and

b.  Failing to take steps to seek appropriate medical care after using unnecessary force and unnecessary restraints.

240.     As a direct and proximate result of Defendant's agents' threat of harmful or offensive contact, Plaintiffs KNN, CM, EU, and RN suffered injuries, including among other things, substantial physical injury resulting in lasting physical pain and emotional distress.

241.     Under the Federal Tort Claims Act, the United States is liable to Plaintiffs KNN, CM, EU, and RN for assault.

## COUNT VI:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### (All Plaintiffs against Defendant United States)

242.     All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

243.     Under Louisiana, Texas, Mississippi, Florida, Alabama, and D.C. law, intentional infliction of emotional distress occurs where the defendant intentionally or recklessly engages in extreme and outrageous conduct that caused the plaintiff severe emotional distress.

244.     The federal employees and officers referenced above intentionally or recklessly engaged in extreme and outrageous conduct that inflicted severe emotional distress on Plaintiffs KNN, CM, EU, and RN.

245.     KNN, CM, EU, and RN were subject to verbal and physical abuse for the purpose of terrorizing them.

246.     Plaintiffs KNN, CM, EU, and RN each suffered severe emotional distress and mental anguish as a result of this conduct.

## COUNT VII:
### 5 U.S.C. § 702: Violation of the Administrative Procedure Act and *Accardi* Doctrine
### (Plaintiffs KNN, CM, and RN against Defendants DHS, ICE, Alejandro Mayorkas, and Patrick Lechleitner)

247.     Pursuant to the *Accardi* doctrine, if an agency fails to follow its own standards, "the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).  "Agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion." *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

248.     Title 8 in the Code of Federal Regulations, Section 208.6, requires ICE and other government agencies to preserve the confidentiality of asylum application materials.  ICE officers understood or should have foreseen that, if these asylum documents were not removed, they would be seized by government officials in Cameroon and could place Plaintiffs in danger of persecution.

249.     Defendants' decision not to comply with or enforce their own standards was a final agency action that caused Plaintiffs injuries in fact. Defendants DHS and ICE's final agency action failed to protect Plaintiffs KNN, CM, and RN's confidentiality by denying them access to their baggage at Prairieland Detention Center in Alvarado, Texas, prior to being transferred to the Fort Worth Alliance Airport for removal to Cameroon – in violation of 8 C.F.R. § 208.6(b) and Defendants DHS and ICE's own policies.

250.     Defendant DHS and ICE are bound to the confidentiality protections for individuals in asylum-related proceedings.  Per 8 C.F.R. § 208.6(b), "[t]he confidentiality of other records kept by DHS and the Executive Office for Immigration Review that indicate that a specific alien has applied for refugee admission asylum, withholding of removal under section 241(b)(3) of the Act, or protection under regulations issued pursuant to the Convention Against Torture's implementing legislation, or has received a credible fear or reasonable fear interview, or received a credible fear or reasonable fear review shall also be protected from disclosure . . . ."

251.    Courts have interpreted 8 C.F.R. § 208.6 as prohibiting disclosure that would allow a third party, such as the Cameroonian government, to link the identity of the asylum seeker to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum. *Lin v. U.S. Dep't of Just.*, 459 F.3d 255, 263 (2d Cir. 2006) (citing U.S. Citizenship and Immigration Services, Fact Sheet: Federal Regulations Protecting the Confidentiality of Asylum Applicants (June 3, 2005)).[55]

252.    Besides violating a federal regulation, deportation after denial of access to baggage also violates the PBNDS, which governed the Prairieland Detention Center at the time of plaintiffs' removal. PBNDS Standard 7.4 states that "[d]uring transport, a detainee shall ordinary have . . . in his or her possession . . . [a]ll legal material." Part 7.4, p. 461. Denial of access to a bag to remove legal material prevents people from having that material in their possession. Similarly, Part 1.3 requires DHS to verify, before transport, that each individual "has in his/her possession all funds, valuables, and other personal property listed on the property inventory form." Part 1.3, p. 41. Additionally, Part 2.5 provides that "property shall be returned to the detainee" prior to release or transfer. Part 2.5, p. 97. Part 2.5 also lists legal documents as personal property that detainees are allowed access to at various times during their detention. Part 2.5, p. 92.

---

[55]    In this fact sheet DHS explains "public disclosure [of information contained pertaining to asylum applications] might, albeit in rare circumstances, give rise to a plausible protection claim where one would not otherwise exist by bringing an otherwise ineligible claimant to the attention of the government authority or non-state actor against which the claimant has made allegations of mistreatment." USCIS Interoffice Memorandum re: Fact Sheet on Confidentiality (Jun. 15, 2005), https://www.uscis.gov/sites/default/files/document/fact-sheets/fctsheetconf061505.pdf.

253.     Defendants DHS and ICE violated these confidentiality policies, failed to protect Plaintiffs and subjected them to imminent risks of retaliatory violence by the Cameroonian government and non-state actors upon deportation.

**COUNT VIII:**
**5 U.S.C. § 702: Violation of the Administrative Procedure Act and *Accardi* Doctrine**
**(Plaintiffs KNN, CM, EU, and RN against Defendants DHS, ICE, Alejandro Mayorkas,**
**and Patrick Lechleitner)**

254.     Pursuant to the *Accardi* doctrine, if an agency fails to follow its own standards, "the APA (as developed by case law) gives aggrieved parties a cause of action to enforce compliance." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). "Agencies cannot relax or modify regulations that provide the only safeguard individuals have against unlimited agency discretion." *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003).

255.     Plaintiffs suffered isolation, impermissible use of restraints, unnecessary force, and denials of healthcare, including treatment for both pre-existing conditions and injuries suffered in custody, while detained in DHS and ICE custody and during the deportation process.

256.     Defendants DHS and ICE failed to comply with and ensure compliance with their own policies regarding removals, use of force, and health care, as set out in the PBNDS. Defendants' failure to act was a final agency action that caused Plaintiffs injuries in fact.

257.     As explained in more detail above, using unnecessary force on detainees violates the PBNDS. PBNDS Standard 2.15 authorizes DHS agents to use reasonable and necessary force only after all other reasonable efforts to resolve the issue have failed. Part 2.15, pg. 200. Restraint devices "shall only be used as a precaution against escape during transfer; for medical reasons, when directed by the medical officer; or to prevent self-injury, injury to others, or property damage." Part 2.15, pg. 202. The PBNDS further provides that "restraints shall be

applied for the least amount of time necessary to achieve the desired behavioral objective. Part 2.15, pg. 202.

258.    The PBNDS further states that restraint equipment or devices, such as handcuffs, may not be used to cause physical pain or discomfort. Part 2.15, pg. 202. Unnecessarily tight restraints are prohibited. Part 2.15, pg. 202.

259.    When DHS and ICE subject detainees to the use of force, detainees "shall be seen by medical staff as soon as possible." Part 2.15, pg. 202.  If detainees suffer injury because of the use of force, "a medical evaluation shall be obtained and appropriate care provided." Part 2.15, pg. 202.

260.    Failing to provide proper medical treatment and timely healthcare services violates the PBNDS. According to PBNDS Standard 4.3, detainees "shall have access to a continuum of healthcare services, including screening, prevention, health education, diagnosis, and treatment. Part 4.3, pg. 257. Additionally, detainees "shall be able to request health services on a daily basis and shall receive timely follow-up. Part 4.3, pg. 257. Detention facilities are also required to timely respond to medical complaints and take detainees' medical needs into account before transferring detainees to other facilities. Part 4.3, pgs. 260, 276.

261.    Defendants DHS and ICE's failure to properly enforce their own use of force, medical care, and removal policies subjected Plaintiffs to ongoing, severe physical pain and emotional distress.


## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) award Plaintiffs all available compensatory damages in an amount to be proven at trial;

(2) declare that the conduct of Defendants DHS and ICE, as alleged in the Complaint, violated their own agency policies and regulations and thus violates the Administrative Procedure Act;

(3) order the Defendants to allow Plaintiffs KNN, RN, and CM to renew their asylum claims in light of the unlawful disclosure of their confidential information;

(4) award attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

(5) grant such other relief as the Court deems just and equitable.

Dated: September 19, 2023

*Respectfully submitted,*

/s/ Sarah T. Gillman
Sarah T. Gillman (D.D.C. Bar #NY0316)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., 8th Fl., Ste. 801
New York, NY 10005
T:(646)289-5593
E: gillman@rfkhumanrights.org

Sarah E. Decker**
ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Suite 750
Washington, D.C. 20036
Tel: 908-967-3245
E: decker@rfkhumanrights.org

Fatma E. Marouf*
Sara Zampierin*
Emma Blackmon***
Harris R. Dubin***

-58-

Donté D. Houston***
Ana Martinez***
Payton Molina***
CIVIL RIGHTS CLINIC & IMMIGRANT RIGHTS CLINIC, TEXAS A&M UNIVERSITY SCHOOL OF LAW[i]
307 W 7th St., Suite LL50
Fort Worth, TX 76102
T: (817) 212-4123
E: fatma.marouf@law.tamu.edu
E: sara.zampierin@law.tamu.edu

*Attorneys for Plaintiffs*

\*_Pro hac vice_ petition or Attorney Admission petition forthcoming
\*\* Attorney admission pending
\*\*\* Petition for certification of law students forthcoming

---

[i] Plaintiffs in this case are represented by clinics operated by Texas A&M University School of Law, but this document does not purport to present the school's institutional views, if any.