**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

K.N.N., et al,

Plaintiffs,

v.                                                  Civil Action No. 23-2748 (APM)

UNITED STATES OF AMERICA, et al.,

Defendants.

## <u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER AND DISMISS</u>

# TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................1

    I    Factual Background ............................................................................1

    II    Administrative Exhaustion................................................................5

LEGAL STANDARDS .........................................................................................5

    I    Fed. R. Civ. P. 12(b)(1).....................................................................5

    II    Fed. R. Civ. P. 12(b)(3).....................................................................6

    III    Fed. R. Civ. P. 12(b)(6).....................................................................6

ARGUMENT ........................................................................................................7

    I    The Court Should Not Transfer or Dismiss This Case Based on Venue .................7

        A.    Plaintiffs Allege Sufficient Facts Showing Ties to This District.................7

        B.    Involvement Of D.C.-Based Officials Is Sufficient To Establish Venue In This District Under The FTCA Venue Statute. ......................................................9

        C.    Private And Public Interest Factors Are Neutral Or Do Not Weigh Against Venue In This District...........................................................13

    II    The Court Should Allow Venue Discovery Before Transferring the Action ........20

    III    The Court Should Not Dismiss Plaintiffs' Claims.................................................24

        A.    Plaintiffs Have Exhausted Administrative Remedies. .............................24

        B.    Plaintiffs Have Adequately Pled D.C.-Based Torts..................................28

        C.    Plaintiffs' APA Claims Are Not Foreclosed.............................................41

CONCLUSION....................................................................................................45

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys. v. Gardner*,
   387 U.S. 136 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430
   U.S. 99 (1977)...................................................................................................43

*Aishat v. Dep't of Homeland Security*,
   288 F. Supp. 3d 261 (D.D.C. 2018) ...................................................................19

*Ashtari v. Pompeo*,
   496 F. Supp. 3d 462 (D.D.C. 2020) .................................................................5, 6

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
   571 U.S. 49 (2013)..............................................................................................19

*Baltimore v. District of Columbia*,
   10 A.3d 1141 (D.C. 2011) ..................................................................................36

*Bederson v. United States*,
   935 F. Supp. 2d 48 (D.D.C. 2010) .....................................................................13

*Black v. Sheraton Corp. of Am.*,
   564 F.2d 531 (D.C. Cir. 1977)............................................................................32

*Blair v. District of Columbia*,
   190 A.3d 212 (D.C. 2018) ..................................................................................39

*Bourdon v. United States Dep't of Homeland Sec.*,
   235 F. Supp. 3d 298 (D.D.C. 2017) ...................................................................17

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988).............................................................................................42

*Burchfield v. United States*,
   168 F.3d 1252 (11th Cir. 1999) ..........................................................................27

*Cabrera Cabrera v. U.S. Citizenship & Immigr. Servs.*,
   374 F. Supp. 3d 153 (D.D.C. 2019) ..................................................................5, 6

*Citizens for Responsibility & Ethics in Wash. v. U.S. Immigration & Customs
   Enforcement*,
   1:21-cv-00708-EGS (D.D.C., filed Mar. 17, 2021) .............................................4

*Clark v. DocuSign, Inc.*,
   No. 21-cv-1007 (DLF), 2022 WL 16985185 (D.D.C. Nov. 15, 2022)..................6

*Collins v. United States*,
    996 F.3d 102 (2d Cir. 2021)..........................................................................27

*Cruz v. Dep't of Homeland Sec.*,
    No. 19-cv-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019).................................18

*De Martinez v. Lamagno*,
    515 U.S. 417 (1995)....................................................................................44

*Defenders of Wildlife v. Salazar*,
    No. 12-1833, slip op. (D.D.C. Apr. 11, 2013) .......................................................15

*Delta Sigma Theta Sorority, Inc. v. Bivins*,
    215 F. Supp. 3d 12 (D.D.C. 2013) ..............................................................6, 20

*Dickey v. United States*,
    174 F. Supp. 3d 366 (D.D.C. 2016) ...............................................................32

*District of Columbia v. Tulin*,
    994 A.2d 788 (D.C. 2019) ..........................................................................40

*Drejza v. Vaccaro*,
    650 A.2d 1308 (D.C. 1994) .........................................................................37

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum.*
    *Servs.*,
    396 F.3d 1265 (D.C. Cir. 2005).....................................................................42

*Est. of Underwood v. Nat'l Credit Union Admin.*,
    665 A.2d 621 (D.C. 1995) ..........................................................................37

*F.C.C. v. United States*,
    No. 22-cv-5057 (NRM) (JMW), 2023 WL 5718440 (E.D.N.Y. Sept. 5, 2023)..........11, 12, 21

*F.D.I.C. v. Meyer*,
    510 U.S. 471 (1994)................................................................................43, 44

*Franz v. United States*,
    591 F. Supp. 374 (D.D.C. 1984)..........................................................10, 11, 12, 21

*GAF Corp. v. United States*,
    818 F.2d 901 (D.C. Cir. 1987)......................................................................24

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009).................................................................43, 44

*Gulf Restoration Network v. Jewell*,
    87 F. Supp. 3d 303 (D.D.C. 2015)..........................................................14, 15, 18

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ......................................................................5

*Hitchcock v. United States*,
  665 F.2d 354 (D.C. Cir. 1981) ......................................................... *passim*

*Hoeller v. Soc. Sec. Admin.*,
  670 F. App'x 413 (7th Cir. 2016) ................................................................24

*Homan v. Goyal*,
  711 A.2d 812 (D.C. 1996), *opinion amended*, 720 A.2d 1152 (D.C. 1998)...........................37

*Hughes Wood Products, Inc. v. Wagner*,
  18 S.W.3d 202 (Tex. 2000)..........................................................................30

*Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*,
  No. 20-784 (JDB), 2020 WL 4201661 (D.D.C. July 22, 2020).......................6

*James v. District of Columbia*,
  869 F. Supp. 2d 119 (D.D.C. 2012) ...........................................................40

*Johnson by Johnson v. United States*,
  788 F.2d 845 (2d Cir. 1986), *cert. denied*, 479 U.S. 914 (1986), *overruled on*
  *other grounds sub nom. Sheridan v. United States*, 487 U.S. 392 (1988) ..............................27

*Jonathan Woodner Co. v. Breeden*,
  665 A.2d 929 (D.C. 1995), *opinion amended on denial of reh'g*, 681 A.2d
  1097 (D.C. 1996) .........................................................................................38

*Jones v. District of Columbia*,
  No. 21-836 (RC) 2021 WL 5206207 (D.D.C. Nov. 9, 2021) .....................38

*Katz v. District of Columbia*,
  285 A.3d 1289 (D.C. 2022) .........................................................................39

*Kauffman v. Anglo–Am. Sch. of Sofia*,
  28 F.3d 1223 (D.C. Cir. 1994) ......................................................................9

*Lin v. U.S. Dep't of Just.*,
  459 F.3d 255 (2d Cir. 2006)...........................................................................9

*Maynard v. Melton*,
  No. CV1702612KBJRMM, 2021 WL 6845008 (D.D.C. Apr. 7, 2021).................................31

*McCarthy v. Kleindienst*,
  741 F.2d 1406 (D.C. Cir. 1984) ..................................................................35

*McDaniel v. Ritter*,
    556 So. 2d 303 (Miss. 1989) ............................................................................................30

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
    No. 79-1182, 1983 WL 1881 (D.D.C. Oct. 4, 1983) ...................................................6

*Medina v. United States*,
    259 F.3d 220 (4th Cir. 2001) .........................................................................................33

*Millbrook v. United States*,
    569 U.S. 50 (2013) ....................................................................................................32, 33

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) .........................................................................................24

*Ortberg v. Goldman Sachs Grp.*,
    64 A.3d 158 (D.C. 2013) ..........................................................................................37, 38

*Park v. Howard Univ.*,
    71 F.3d 904 (D.C. Cir. 1995) .........................................................................................24

*Patel v. Phillips*,
    933 F. Supp. 2d 153 (D.D.C. 2013) .................................................................................9

*Project S. v. U.S. Immigr. & Customs Enf.*,
    No. 1:21-cv-8440 (ALC) (BCM), 2024 WL 1116164 (S.D.N.Y. Mar. 12,
    2024) ...........................................................................................................20, 22, 33

*Project S. v. U.S. Immigr. & Customs Enf.*,
    No. 1:21-cv-8440 (S.D.N.Y.) .........................................................................................3

*Project South and Center For Constitutional Rights v. United States Immigration
    and Customs Enforcement, et al.*,
    Case No. 1:21-CV-8440 (ALC)(BM) .............................................................................22

*Raflo v. United States*,
    157 F. Supp. 2d 1 (D.D.C. 2001) ..............................................................................29, 30

*Reuber v. United States*,
    750 F.2d 1039 (D.C. Cir. 1984) .......................................................................................9

*Richards v. United States*,
    369 U.S. 1 (1962) ....................................................................................................29, 41

*Rise v. United States*,
    630 F.2d 1068 (5th Cir. 1980) ..............................................................................25, 26, 27

*Rossville Convenience & Gas, Inc. v. Barr*,
  453 F. Supp. 3d 380 (D.D.C. 2020) ...............................................................14, 15, 16

*Santiago–Ramirez v. Sec'y of Dep't of Def.*,
  984 F.2d 16 (1st Cir. 1993) ...............................................................................32

*Scott v. District of Columbia*,
  101 F.3d 748 (D.C. Cir. 1996) ...........................................................................35

*Sledge v. United States*,
  723 F. Supp. 2d 87 (D.D.C. 2010) .....................................................................20

*Spiller v. District of Columbia*,
  362 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................35

*Spotts v. United States*,
  562 F. Supp. 2d 46 (D.D.C. 2008) ................................................................12, 13

*Taylor v. Appleton*,
  30 F.3d 1365 (11th Cir. 1994) ............................................................................24

*Thorp v. District of Columbia*,
  319 F. Supp. 3d 1 (D.D.C. 2018) .......................................................................35

*Tookes v. United States*,
  811 F. Supp. 2d 322 (D.D.C. 2011) ...............................................................24, 25

*United States v. Shearer*,
  473 U.S. 52 (1985) (plurality opinion) ..............................................................40

*Watson v. United States*,
  865 F.3d 123 (2d Cir. 2017) ...............................................................................33

*Weiner v. Novartis Pharms. Corp.*,
  991 F. Supp. 2d 217 (D.D.C. 2013) ...................................................................17

*Wesberry v. United States*,
  205 F. Supp. 3d 120 (D.D.C. 2016) ...................................................................20

*Whelan v. Abell*,
  953 F.2d 663 (D.C. Cir. 1992) ...........................................................................36

*Wolfram Alpha LLC v. Cuccinelli*,
  490 F. Supp. 3d 324 (D.D.C. 2020) ...................................................................19

**Statutes**

5 U.S.C. § 552 ...................................................................................................24

5 U.S.C. § 552(b)(6) .................................................................................................... 22

5 U.S.C. § 552(b)(7) .................................................................................................... 22

5 U.S.C. § 703 ............................................................................................................... 7

5 U.S.C. § 704 ............................................................................................................. 42

8 U.S.C. § 1103 ........................................................................................................... 33

8 U.S.C. § 1357(a) ...................................................................................................... 33

28 U.S.C. § 1346(b) ............................................................................................. 29, 43

28 U.S.C. § 1391(e)(1)(A) ............................................................................................ 7

28 U.S.C. § 1391(e)(1)(B) ............................................................................................ 7

28 U.S.C. § 1402(b) ........................................................................................... 9, 10, 13

28 U.S.C. § 2401(b) ...................................................................................................... 5

28 U.S.C. § 2675 ......................................................................................................... 24

28 U.S.C. § 2675(a) ...................................................................................................... 5

28 U.S.C. § 2679(a) .................................................................................................... 43

28 U.S.C. § 2679(b) .................................................................................................... 43

28 U.S.C. § 2679(b)(1) ............................................................................................... 44

28 U.S.C. § 2680(h) .................................................................................................... 32

La. Civ. Code art. 3515 .............................................................................................. 30

La. Civ. Code art. 3542 .............................................................................................. 30

**Rules & Regulations**

8 C.F.R. § 208.6 ............................................................................................................ 9

8 C.F.R. § 208.6(b) .................................................................................................... 8, 9

8 C.F.R. § 287.5(c) ..................................................................................................... 33

8 C.F.R. § 287.5(d) ..................................................................................................... 33

Fed. R. Civ. P. 8 ........................................................................................................ 6, 7

Fed. R. Civ. P. 12(b)(3)...........................................................................................6

Fed. R. Civ. P. 12(b)(6)...........................................................................................6

Fed. R. Civ. P. 26(c).............................................................................................24

Fed. R. Civ. P. 34................................................................................................24

Rule 12(b)(1)...................................................................................................5, 10

Rule (b)(3)........................................................................................................10

**Other Authorities**

*Available at* https://www.ice.gov/doclib/detention-
        standards/2011/pbnds2011r2016.pdf.....................................................28

Restatement (Second) of Conflict of Laws § 145: 1...................................30

U.S. Immigrations and Customs Enforcement, Field Operations,
        https://www.ice.gov/about-ice/ero#fieldOps .........................................4

Plaintiffs are four Cameroonian asylum seekers whom ICE officers inhumanely placed and kept in a full-body restraint device called "The WRAP" for hours before and during flights to facilitate their deportation. Plaintiffs were strapped into the restraint with a cord pulling their chest to their legs to force them to stay in an acute stress position, causing Plaintiffs excruciating pain and severe medical consequences. These actions came after months and years of physical and medical abuse in ICE detention, where Plaintiffs were shuffled to multiple facilities. Government officials in Washington, D.C. were directly involved in overseeing, directing, and coordinating Plaintiffs' detention and deportation. For the reasons set forth herein, Plaintiffs have more than adequately pled facts sufficient to show that subject matter jurisdiction and venue properly lie in this District and to state claims for relief under the Federal Tort Claims Act and Administrative Procedure Act. Accordingly, Defendants' motion (Doc. 16) should be denied.

## BACKGROUND

### I    Factual Background

While in the custody of the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE"), Plaintiffs were subjected to physical abuse, medical neglect, and improper use of restraints. Each plaintiff was subjected to a full-body restraint device, "The WRAP," that caused them severe physical and mental harm as part of flights to facilitate their removal in Texas and Louisiana[1] in late 2020. (Doc. 1 ¶¶ 35-38, 106-147.) Plaintiffs were restrained in The WRAP to silence and punish them and other Cameroonian migrants for raising concerns about their treatment in ICE custody and about the danger facing them in Cameroon. (*Id.* ¶¶ 37, 123.) In clear contradiction to the device manufacturer's protocols, ICE officers left

---

[1] The government repeatedly incorrectly contends that "*all* the alleged misuse of the WRAP . . . occurred within the Northern District of Texas." Doc. 16-1 at 6. However, Plaintiff R.N. was placed in The WRAP in his cell in Alexandria, Louisiana, and taken outside to the tarmac, where he was left in The WRAP for over an hour before it was removed prior to his boarding the plane. (Doc. 1 ¶¶ 120-23.)

Plaintiffs confined in the WRAP for hours as they tried to alert officers to their medical issues and pain from the tightened strap folding their bodies into an acute angle stress position. (*Id.* ¶¶ 106-147.) ICE officers also disregarded regulations requiring confidentiality for asylum seekers, resulting in the persecution and hardship of Plaintiffs K.N.N., R.N., and C.M. following their removal. (*Id.* ¶¶ 185-212.)

High-level officers at DHS and ICE headquarters in Washington, D.C. were well-aware of persistent abuses by officers against individuals in ICE custody, including the range of abuses used against Plaintiffs and other Cameroonians during this time period and other similar medical neglect, racism, and improper use of force and restraints in flights. (*Id.* ¶¶ 79-83, 175-84.) D.C.-based supervisory officials were aware of the abusive tactics ICE agents and other officers weaponized against Plaintiffs in detention and during the deportation process, which had been well-documented in the press, multiple reports to oversight agencies such as the DHS Office of Civil Rights and Civil Liberties ("CRCL"), and inquiries by politicians. *Id.* ¶¶ 79-83. Plaintiff R.N. was part of a group of Cameroonians who suffered physical force when they refused to sign or provide fingerprints for travel documents at the Adams County Correctional Center, which was reported to CRCL on October 7, 2020 (*id.* ¶¶ 97–99), and C.M. was a complainant in a CRCL complaint about similar use of force at Jackson Parish Correctional Center (*id.* ¶¶ 76, 101-05).

High-level DHS/ICE officers also coordinated the mass deportation flights to Cameroon in October and November 2020. (*Id.* ¶¶ 84-88.) They designated these flights as "Special High Risk Charters," which placed a SWAT team on these flights that regularly used The WRAP. (*Id.* ¶¶ 88, 154-55.) CRCL has indicated that it found ICE used the WRAP on Plaintiffs and others based on

a "lack of policy, oversight, . . [and] training" that plausibly implicates officials operating from D.C. headquarters.  Declaration of Sara Zampierin ("Zampierin Decl."), Ex. J. at 1.[2]

Documents uncovered thus far during related Freedom of Information Act ("FOIA") litigation[3] confirm the role of D.C.-based DHS and ICE officials in coordinating and approving these mass deportation flights. *See* Zampierin Decl., Ex. D–I. In emails dated August 10, 2020, a D.C.-based ICE official—the Unit Chief, ICE ERO-Removal Division, Removal and International Operations- Africa, based in Washington, D.C. ("Unknown ICE ERO Unit Chief")—notified multiple ICE officials that the October 2020 Special High-Risk Charter flight to Cameroon had been approved and coordinated with those officials to select a date for the flight. Zampierin Decl., Ex. D at 1028–30. In another email dated August 14, 2020, a Detention and Deportation Officer at the ICE Air Operations Division ("Unknown ICE Air Officer") directly communicated with a D.C.-based DHS official—the Embassy Liaison/Desk Officer, Enforcement and Removal Operations, ICE—in coordinating the October 2020 flight. *Id.* at 1026–27. In an email thread dated October 9, 2020, the Unknown ICE Air Officer sent a draft flight itinerary to multiple ICE officials, including a D.C.-based Detention and Deportation Officer and likely others at headquarters, for the "Special High Risk Charter" to Cameroon, and they requested "an expedited approval." Zampierin Decl., Ex. E at 1002, 1004–06. Further, in emails between the Unknown ICE Air Officer and the Unknown ICE ERO Unit Chief—a D.C.-based official — individual officers coordinated "all the particulars" of the October flight. *Id.*, Ex. F, at 996). Another email among ICE officers coordinating a Special High Risk Charter to Cameroon references ICE's "very own ICE HRV Expert [redacted] from HQs." *Id.*, Ex. G, at 330–31. This indicates that in coordinating "high risk"

---

[2] This letter came as a result of Plaintiffs' CRCL complaint about the WRAP.  *Id.* ¶ 173
[3] *Project S. v. U.S. Immigr. & Customs Enf.*, No. 1:21-cv-8440 (S.D.N.Y.). *See* Zampierin Decl., Ex. A-C.

removals from the United States, local ICE deportation officials and ICE Air officials rely on the guidance and instruction of ICE officials based in DC.

ICE headquarters' involvement in the planning and coordination of Plaintiffs' removal flight is consistent with ICE's own policy. *Id.*, Ex. H. The ICE Air Operations Handbook states plainly, "Movements via [ICE Air Operations] **are routinely coordinated with the [Headquarters] Field Operations Division** to ensure the efficient management of [Enforcement and Removal Operations]'s detention resources." *Id.* at 6 (emphasis added). Specifically, per policy, ICE's Removal and International Operations unit coordinates Special High-Risk Charter Flights, such as the Plaintiffs'. *Id.* at 7.

Furthermore, as evidenced by additional emails obtained from separate FOIA litigation,[4] the "Acting Assistant Director" of ERO Field Operations, likely a D.C.-based officer,[5] made decisions to stay or go forward with the October 2020 deportations of individual Cameroonian migrants who had been a part of a civil rights complaint against officials at Adams County Correctional Center, an ICE detention center in Mississippi. *Id.*, Ex. I, at 0140–41; 0145–46. The Acting Assistant Director in this instance decided to stay the removals of two individuals to allow for their interview by CRCL, but refused the request to interview two other Cameroonian complainants because their records indicated that ICE had categorized them as "Failure to Comply." *Id.* at 0141. Though Plaintiffs currently have access only to these emails regarding the Adams County complaint, the email exchange indicates that headquarters-level officials[6] were

---

[4] *Citizens for Responsibility & Ethics in Wash. v. U.S. Immigration & Customs Enforcement*, 1:21-cv-00708-EGS (D.D.C., filed Mar. 17, 2021).
[5] The Field Operations division operates at Headquarters to "provide guidance to and coordination among" ICE field offices across the country. *See* U.S. Immigrations and Customs Enforcement, Field Operations, https://www.ice.gov/about-ice/ero#fieldOps.
[6] In addition to the Acting Assistant Director, additional indications of D.C. involvement in decision making include multiple email addresses "@HQ.DHS.GOV" (Ex. I at 0149) and references to a "DAD" (likely, Deputy Assistant Director), weighing in on some redacted questions (*Id.* at 0147).

likely involved in determining whether complainants or witnesses for this and other CRCL complaints were removed from planned flights or deported.

## II      Administrative Exhaustion

On July 29, 2022, Plaintiffs submitted administrative claims to DHS, ICE, and the Department of Health and Human Services ("HHS") pursuant to 28 U.S.C. § 2675(a). On March 20, 2023, DHS and ICE denied Plaintiffs' administrative claims, fulfilling the prerequisite for the filing of this action under 28 U.S.C. § 2401(b). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

## LEGAL STANDARDS

## I      Fed. R. Civ. P. 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction. A court reviewing a Rule 12(b)(1) motion must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (citations omitted). In its review, the Court may also consider "'such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case.'" *Cabrera Cabrera v. U.S. Citizenship & Immigr. Servs.*, 374 F. Supp. 3d 153, 158 (D.D.C. 2019) (citation omitted); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)). "Specifically, when it is necessary to look beyond the face of the complaint to determine whether the court has subject matter jurisdiction, 'the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Cabrera*, 374 F. Supp. 3d at 158 (citation omitted)).

## II        Fed. R. Civ. P. 12(b)(3)

"In considering a Rule 12(b)(3) motion, the Court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor." *Clark v. DocuSign, Inc.*, No. 21-cv-1007 (DLF), 2022 WL 16985185, at *1 (D.D.C. Nov. 15, 2022) (citations and internal quotation marks omitted)). The Court also "may consider material outside of the pleadings." *Id*. Discovery on venue issues is permissible. *See Delta Sigma Theta Sorority, Inc. v. Bivins*, 215 F. Supp. 3d 12, 15 (D.D.C. 2013) (discovery granted on venue issue); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, No. 79-1182, 1983 WL 1881, at *2 (D.D.C. Oct. 4, 1983) (authorizing discovery "with respect to the pivotal venue issue" over defendants' opposition).

## III       Fed. R. Civ. P. 12(b)(6)

A complaint must "state a claim upon which relief can be granted" to avoid dismissal under Rule 12(b)(6). *Ashtari*, 496 F. Supp. 3d at 467. "'[D]etailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion." *Id.* (citation omitted). However, "a complaint must contain sufficient factual matter, [if] accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashtari*, 496 F. Supp. 3d at 467 (alteration in original) (citation omitted).

Courts reviewing a motion to dismiss under Rule 12(b)(6) must "accept as true all of the plaintiff's allegations of fact, and must also 'grant plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Inova Health Care Servs. for Inova Fairfax Hosp. v. Omni Shoreham Corp.*, No. 20-784 (JDB), 2020 WL 4201661, at *3 (D.D.C. July 22, 2020) (citation omitted). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cabrera*, 374 F. Supp. 3d at 159 (citation omitted). The pleading standard in Federal Rule of Civil Procedure 8 "demands    more    than    an    unadorned,    the-defendant-unlawfully-harmed-me

accusation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

## ARGUMENT

**I      The Court Should Not Transfer or Dismiss This Case Based on Venue.**

Venue is proper in this Court, and the Court should not transfer the case to the Northern District of Texas. Defendants do not move to dismiss Plaintiffs' APA claims based on venue, nor can they. *See* 28 U.S.C. § 1391(e)(1)(A), (B); 5 U.S.C. § 703. Rather, Defendants ignore Plaintiffs' well-pled allegations of conduct in the District of Columbia to assert both that transfer is appropriate and that venue is improper for the FTCA claims. Defendants' Motion should be denied because Plaintiffs have alleged that relevant acts occurred in D.C., and Defendants have failed to meet their burden that the interests of convenience or justice require transfer.

**A.      Plaintiffs Allege Sufficient Facts Showing Ties to This District.**

Defendants' motion relies heavily on the assertion that "the District of Columbia has few, if any, factual ties to this case." (Doc. 16-1 at 15). The facts already known to Plaintiffs and asserted in Plaintiffs' Complaint, which this Court must accept as true for purposes of the venue analysis, tell a different story. Plaintiffs assert in detail that officials located in the District of Columbia actively participated in and, in important respects, directed and coordinated the wrongful conduct that Plaintiffs experienced across multiple jurisdictions. Moreover, it is anticipated that discovery sought by Plaintiffs (and resisted by Defendants) will provide further evidence of Defendants' ties to and conduct in the District of Columbia supporting venue in this district. *See* Argument § II, *infra*.

The facts pled by Plaintiffs show numerous factual ties to the District of Columbia at times relevant to this suit. Defendants' misconduct falls into three broad categories:

**Abuses in detention and deportation.** Despite knowledge of complaints and inquiries regarding abuses in detention and the deportation flights, DHS and ICE designated the deportation flights as Special High Risk Charters and placed a SWAT team on the flight predisposed to using force and unnecessary restraints. Both as a matter of policy and based on emails about the October and November 2020 flights, DHS and ICE officials in the District of Columbia coordinated logistics for these flights. (Doc. 1 ¶¶ 3, 88); Zampierin Decl. Ex. D–I.

High level ICE and DHS officials in the District of Columbia also directly oversaw conditions at the relevant detention facilities (which were located not only in Texas, but in Louisiana, Mississippi, Alabama, and Florida) and were aware of abuse therein, including the forced fingerprinting RN and CM suffered in Louisiana and Mississippi that formed the basis of two CRCL complaints. (Doc. 1 ¶¶ 76, 97–99, 101-05.) These officials failed to comply with and ensure compliance with their own binding policies regarding removals, use of force, segregation, and health care and hold individual officers accountable. (*e.g.* Doc. 1 ¶¶ 83-92)

**Retaliatory scheduling of deportation flights in response to protesting.** DHS and ICE officials in the District of Columbia were on notice of ICE officials' abusive and retaliatory behavior in response to Cameroonians' peaceful protests and refusal to sign documents assenting to their removal, including Plaintiffs. (*Id.* ¶¶ 72-92). Despite this notice, DHS and ICE proceeded with the retaliatory scheduling of deportation flights. Officials at headquarters had the power to stop these flights or hold individuals from the flights if they could be witnesses in civil rights complaints, but, in one instance captured in publicly-available emails, chose to deport people who they deemed to be a "failure to comply." Zampierin Decl. Ex. I.

**Confidentiality violations.** DHS and ICE are bound to the confidentiality protections for individuals in asylum-related proceedings under 8 C.F.R. § 208.6(b) of the INA. These claims are

properly brought under the APA against the agencies themselves, which reside in D.C. DHS and

ICE failed to protect Plaintiffs' confidentiality by denying them access to their bags at Prairieland

Detention Center[7] prior to transfer to the Fort Worth Alliance Airport for removal to Cameroon,

in violation of 8 C.F.R. § 208.6(b) and Defendants' own policies. [8] (Doc. 1 ¶¶ 247-253).

   DHS and ICE's violation of these confidentiality policies resulted in Plaintiffs' detention,

prosecution, and abuse when they arrived in Cameroon. (*Id.* ¶¶ 196-212).

   **B.    Involvement Of D.C.-Based Officials Is Sufficient To Establish Venue
         In This District Under The FTCA Venue Statute.**

   Factually germane cases analyzing venue under the FTCA venue statute, 28 U.S.C. §

1402(b), counsel in favor of maintaining venue in this District. Further, the case law relied upon

by Defendants is based on a fundamental misapplication of underlying FTCA cases.[9]

   Venue is proper in this District under section 1402(b) because, as pled in Plaintiffs'

Complaint, D.C.-based officials at DHS and ICE bore responsibility for the development,

direction, and implementation of the government policies which led to Plaintiffs' mistreatment by

---

[7] Contrary to Defendants' assertions, Plaintiffs do not allege that any actions related to this violation took place in Louisiana. Rather, Plaintiffs allege that relevant actions took place on the ground in Texas and through oversight, direction, and coordination in D.C.

[8] 8 C.F.R. § 208.6 requires the confidentiality of asylum and related records, and it has been interpreted to prohibit disclosure that would allow a third party to link the identity of the asylum seeker to: (1) the fact that the applicant has applied for asylum; (2) specific facts or allegations pertaining to the individual asylum claim contained in an asylum application; or (3) facts or allegations that are sufficient to give rise to a reasonable inference that the applicant has applied for asylum. *Lin v. U.S. Dep't of Just.*, 459 F.3d 255, 263 (2d Cir. 2006) (Doc. 1 ¶ 251).
   Deportation after denial of access to baggage also violates several Standards set out in the PBNDS, which governed the Prairieland Detention Center at the time of Plaintiffs' removal. (Doc. 1 ¶ 252). Under the applicable PBNDS Standards, detained people are entitled to have in their possession all legal material. (*Id.*) In addition, DHS must verify before transport that detained people have in their possession "all funds, valuables, and other personal property listed on the property inventory form." *Id.* Moreover, the PBNDS provides that "property shall be returned to the detainee prior to release or transfer." *Id*.

[9] To the extent Defendants rely on cases like *Patel v. Phillips*, 933 F. Supp. 2d 153, 165 (D.D.C. 2013) in support of their Motion to Transfer Venue, that case relies on a misapplication of the earlier case *Reuber v. United States*, 750 F.2d 1039 (D.C. Cir. 1984) , *Kauffman v. Anglo–Am. Sch. of Sofia*, 28 F.3d 1223 (D.C. Cir. 1994), which explained that "the Supreme Court has already rejected a reading of the place where 'the act or omission occurred' as including any place where the conduct causes injury." Here, the Court has an opportunity for to correct this misapplication by denying the Defendants' Motion to Transfer Venue. *See also Hitchcock v. United States*, 665 F.2d 354 (D.C. Cir. 1981).

government actors during their detention and deportation to Cameroon. These D.C.-based officials' involvement and their "act[s] or omission[s]" in the District are sufficient to satisfy the venue provision for the FTCA. 28 U.S.C. § 1402(b). Based on the well-pled facts in Plaintiffs' complaint, and evidence currently in Plaintiffs' possession, venue is proper in this District, and Defendants' Rule 12(b)(1) and (b)(3) Motion should be denied.

This Court has previously found that the conduct of federal agencies and their agents located in D.C. can create venue in this District under the FTCA Venue Statute. *Franz v. United States*, 591 F. Supp. 374 (D.D.C. 1984). In *Franz*, the plaintiff brought an FTCA claim after his children were placed into the federal witness protection program and transferred to a new residence in Pennsylvania without his knowledge or consent, following his divorce in Pennsylvania and his ex-wife's marriage to a man participating in the witness protection program. *Id.* at 375-76. This Court found that venue was proper in this District, despite that the plaintiff and his ex-wife and children resided in Pennsylvania, his divorce occurred in a court in Pennsylvania, and the Marshals Service —who administered the program—was located in Virginia. *Id.* at 377-78.[10] The Court observed that two D.C.-based offices—the Department of Justice and the Attorney General— "retained overall responsibility for the administration of the [relevant] policies," even though some functions were delegated to the Marshals Service in Virginia. *Id.* at 378. Finally, the Court noted that Department of Justice continued to be involved in the denial of the plaintiff's ability to visit his children, a right which he held under his divorce decree issued by a Pennsylvania Court, through evidence of letters and communications regarding the plaintiff's efforts to visit and contact his children. *Id.* at 378-79. Though the relevant decisions were not "dictated" by D.C.-based

---

[10] Notably, the parties in *Franz* were allowed full discovery on the venue issues before the defendants' venue motions were heard. *Id.* at 376-77.

officials, the Court denied the motion to transfer because D.C. officials were "more than peripherally involved in the course of events leading up to this litigation." *Id.* at 379.

More recently, the Eastern District of New York transferred venue of an FTCA claim to this District in an immigration family separation case. *F.C.C. v. United States*, No. 22-cv-5057 (NRM) (JMW), 2023 WL 5718440 (E.D.N.Y. Sept. 5, 2023). In *F.C.C.*, the plaintiff and his minor child fled from Honduras to the United States due to violence in their home country and were quickly separated from one another when they arrived in Arizona. *Id.* at *1. Thereafter, the plaintiff's child was transferred to a facility in New York. *Id.* The plaintiff brought an FTCA claim in the Eastern District of New York. *Id.* The government sought to transfer the case to the District of Arizona, arguing that "the act or omission complained of" occurred in Arizona, and that "no relevant 'act[s] or omission[s]'" by government officials took place" in D.C. *Id.* (citation omitted). Court-authorized venue discovery showed that a D.C.-based immigration official personally authorized the transfer of plaintiff's daughter to New York, and plaintiff filed his own motion to transfer venue to D.C. *Id.* at *2. The court determined that "venue would likely be proper in the District for the District of Columbia as an original matter" based on the D.C. official's actions authorizing the transfer. *Id.*[11]

Plaintiffs have alleged that ICE officials in Washington, D.C. planned and coordinated the October and November 2020 flight and the transfers immediately prior to that flight. As is discussed in greater detail above and in Plaintiffs' Complaint, D.C.-based immigration officials issued and exchanged numerous emails and memorandums in the time leading up to and resulting

---

[11] The government did not oppose transfer to this District, so the Court was not required to conclusively hold that venue was appropriate in the D.C. District under the FTCA venue statute. *Id.*

in Plaintiffs' deportation to Cameroon and were involved in responses to CRCL complaints involving Cameroonians, including complaints about the forced fingerprinting at issue in this case.

The facts of this case go far beyond some incidental or ancillary involvement of D.C.-based officials in inflicting torts upon the Plaintiffs. Instead, the facts pled by Plaintiffs based on currently available evidence demonstrate that Defendants took actions in D.C. which directly resulted in the complained-of harm to the Plaintiffs. This scenario is strikingly similar to *Franz* where, even though the plaintiff and his family members all lived outside D.C., the actions which resulted in his harm were directed from D.C., ultimately making venue proper in this District. Likewise, in *F.C.C.* the Court (and the government) found venue proper in this District, even though the family separation at issue occurred in Arizona and the affected individuals were transferred to New York, because D.C.-based immigration officials authorized and directed the complained-of conduct at issue in the case. While Plaintiffs seek additional venue discovery to establish more facts connecting this matter to D.C.-based officials, the factual record currently before the Court is sufficient to establish venue in this District, and any additional evidence uncovered in discovery will only further confirm that this is the appropriate venue for this case.

Defendants argue that this case "bears striking resemblance" to *Spotts v. United States*, 562 F. Supp. 2d 46 (D.D.C. 2008). (Doc. 16-1 at 12.) *Spotts* is distinguishable and does not control under the very different facts of this case. As an initial matter, Defendants concede that the holding in *Spotts* rests on a determination that the plaintiffs in that case "could not 'establish that *any* of the acts giving rise to their tort claims occurred in the District of Columbia.'" *Id.* at 13 (emphasis added) (quoting *Spotts*, 562 F. Supp. 2d at 55) (emphasis added). Such is not the case here. Defendants' argument fails to acknowledge that the wrongful conduct of Defendants and resulting harm alleged by Plaintiffs is not solely limited to their detention in Texas. To the contrary,

Plaintiffs allege that Defendants further harmed them in connection with their illegal deportation and transportation to Cameroon, which harm was caused in part by decisions taken and implemented by senior government officials believed to have been acting in the District of Columbia. Again, it is significant that Defendants resist discovery by Plaintiffs that would provide details as to who those government actors were, what actions they took, where they were located when they took the challenged actions, and the like. On the record before the Court, Plaintiffs have shown that Defendants acted wrongfully to Plaintiffs' detriment in the District of Columbia, sufficient to establish venue under 28 U.S.C. § 1402(b).

### C.    Private And Public Interest Factors Are Neutral Or Do Not Weigh Against Venue In This District.

A court determining a motion to transfer venue must consider established private and public interest factors. The private interest factors that are considered include:

(1)    the plaintiff's choice of forum;
(2)    the defendant's choice of forum;
(3)    where the claim arose;
(4)    the convenience of the parties;
(5)    the convenience of the witnesses; and
(6)    the ease of access to the sources of proof.

*Bederson v. United States*, 935 F. Supp. 2d 48 (D.D.C. 2010). The public interest factors include:

(1)    the local interest in making local decisions regarding local controversies;
(2)    the relative congestion of the transferee and transferor courts; and
(3)    the potential transferee court's familiarity with the governing law.

*Id.* at 50. Importantly, Defendants bear the burden to demonstrate that the "balance of convenience of the parties and witnesses and the interest of justice are in favor of transferring venue." *Id.* at 46. Defendants do not satisfy this burden here, where each of the factors are neutral or favor Plaintiffs.

1.    **Private factors**

i.    **The plaintiff's choice of forum**

The plaintiff's chosen forum "is generally afforded 'substantial deference.'" *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 311 (D.D.C. 2015) (citation omitted). However, the "amount of deference is diminished 'where the plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter.'" *Id.* (citation omitted).

Defendants' contention that the District of Columbia has "few, if any, factual ties to this case," (Doc. 16-1 at 15), is contrary to the detailed allegations in Plaintiffs' Complaint that Defendants located in the District of Columbia participated in and even directed the wrongful conduct complained of by Plaintiffs. This is not a case where this district lacks (1) meaningful ties to the controversy or (2) a particular interest in the parties or subject matter.

ii.    **The defendant's choice of forum**

"Unlike plaintiffs' choice of venue, a defendant's choice is not ordinarily accorded deference unless it can 'establish that the added convenience and justice of litigating in its chosen forum overcomes the deference ordinarily given to the plaintiff's choice.'" *Rossville Convenience & Gas, Inc. v. Barr*, 453 F. Supp. 3d 380, 387 (D.D.C. 2020) (citation omitted). A defendant's choice of forum must be given "some weight," provided that the defendant "presents legitimate reasons for preferring to litigate the case in the transferee district." *Gulf Restoration Network*, 87 F. Supp. 3d at 313 (citation omitted). Plaintiffs submit that the reasons presented by Defendants fail to give proper consideration to the facts alleged by Plaintiffs and are therefore unavailing within the correct analytical framework.

Defendants assert that transfer to the Northern District of Texas is appropriate because "[Plaintiffs] only exhausted administratively claims pertaining to acts or omissions that occurred

14

within the Northern District of Texas" and "[Plaintiffs] allege that Defendants Department of Homeland Security (the "Department") and Immigration and Customs Enforcement ("ICE") failed to abide by agency regulations through conduct that allegedly occurred exclusively within the Northern District of Texas." (Doc. 16-1 at 1). As shown throughout this memorandum,[12] Defendants urge an improperly narrow characterization of the facts alleged in Plaintiffs' Complaint, and ignore conduct not only in D.C. but in Louisiana, Mississippi, Alabama, and Florida. Defendants may desire to avoid acknowledging their significant conduct within this District, but the Court must consider all the facts as alleged in the Complaint.

### iii.    Where the claim arose

Plaintiffs assert that their claims arose in more than one location and that significant conduct, policy review, and decision-making by Defendants occurred in this District. Under applicable law, this factor does not support transfer. This Court has held that:

> Where the decision-making process was concentrated in a particular city or state, courts have found this factor to weigh heavily in the transfer analysis. On the other hand, *where the decision-making process was diffuse courts have found this factor to be neutral*.

*Gulf Restoration Network*, 87 F. Supp. 3d at 313 (citations omitted; emphasis added). *See also Defenders of Wildlife v. Salazar,* No. 12-1833, slip op. at 6 (D.D.C. Apr. 11, 2013) (finding the third private-interest factor "essentially neutral" where the final rule "was promulgated by FWS from Washington, D.C., [but] significant decision making also took place in Wyoming").

"A plaintiff is not required to 'bring suit in the district where the most substantial portion of the relevant events occurred.'" *Rossville Convenience & Gas, Inc.*, 453 F. Supp. 3d at 386 (citation omitted). Rather, courts must "undertake a 'common sense appraisal' of the 'events having operative significance in the case,'…to determine where venue is proper." *Id.*

---

[12] *See supra* Background; *infra* Argument Part III.A (noting that Plaintiffs exhausted claims including torts based on inadequate medical care and use of force in other facilities).

#### iv.    The convenience of the parties

In *Rossville Convenience & Gas, Inc.*, the court found the "where the claim arose" factor

and this factor were neutral based on the following facts:

- Neither Plaintiff nor Defendants "has particularly strong ties to either venue: the case involves actions by a District of Columbia-based government agency and has some District-based defendants, and the case also has Northern District of Texas connections and at least one defendant residing there."
- "Because at least some of the material acts that are a part of the factual predicate for the claims took place in this District, while some administrative action took place in the Northern District of Texas, at best for the defendant, these two factors come out as neutral."

453 F. Supp. 3d at 388.

The instant case involves actions by multiple District of Columbia-based government

agencies who also undertook challenged conduct in Texas, Louisiana, Mississippi, Alabama,

Florida and elsewhere. Some of the material acts complained of by Plaintiffs took place in this

District, while others took place in Texas, Louisiana, and elsewhere. These factors are at best

neutral for Defendants and do not support transfer.

#### v.    The convenience of the witnesses

The convenience of witnesses has been "described as 'the most critical factor' on a motion

to transfer." *Id*. (citation omitted). However, "this factor is only considered 'to the extent that the

witness may actually be unavailable for trial in one of the fora,' … which must be proven with

evidence." *Id*. (citation omitted).

Defendants do not contend that any potential witness would be unavailable if there were

an evidentiary hearing in this District. Nor do they identify where any witnesses may be located.

Plaintiffs anticipate that witnesses may be required in the Northern District of Texas, this District,

and other districts in Texas, Louisiana, and elsewhere as well. Under such circumstances, this

factor does not favor transfer. *Id*. ("And neither side argues that if there were an evidentiary

hearing, any prospective witness would be unavailable.").

### vi.    The ease of access to the sources of proof

It has been noted that "[m]odern technology allows most documentary evidence to be easily transferred" and "the location of documents is much less important to determining the convenience of the parties than it once was." *Weiner v. Novartis Pharms. Corp.*, 991 F. Supp. 2d 217, 222 (D.D.C. 2013). As a result, transfer should be disfavored unless "all of the relevant evidence" is located in or near the transferee district. *Id.*

This is not a case in which all relevant evidence will be located in the Northern District of Texas. Plaintiffs complain of conduct by Defendants in this District as well as in Louisiana, Texas, and elsewhere. Plaintiffs do not reside in the Northern District of Texas. Where, as here, relevant evidence will be required in this District as well as multiple other districts, this factor does not weigh in favor of transfer. Defendants do not seriously argue to the contrary.

### 2.    Public factors

### i.    The local interest in deciding local controversies

The determination of whether a controversy is local in nature requires consideration of a number of factors, including:

- where the challenged decision was made;
- whether the decision directly affected the citizens of the transferee state;
- the location of the controversy;
- whether the issue involved federal constitutional issues rather than local property laws or statutes;
- whether the controversy involved issues of state law;
- whether the controversy has some national significance; and
- whether there was personal involvement by a District of Columbia official.

*Bourdon v. United States Dep't of Homeland Sec.*, 235 F. Supp. 3d 298, 308 (D.D.C. 2017).

Defendants argue that "this matter presents a local controversy that should be decided by the Northern District of Texas." (Doc. 16-1 at 18). Plaintiffs' detailed fact-based pleadings alleging Defendants' involvement in misconduct in this District—and across multiple states based on

17

transfers and abuse during detention and deportation— on matters of national significance refute Defendants' characterization of their claims.

Defendants emphasize that Plaintiffs assert FTCA claims under various different state laws including Louisiana, Texas, Mississippi, Alabama, Florida, and District of Columbia and tort claims under District of Columbia law. (Doc. 16-1 at 8). Of course, the mere number of FTCA claims asserted by citing the law of a particular jurisdiction is not dispositive, and, as detailed below, the choice of law analysis on these claims is best done after discovery. Defendants' arguments consistently fail to acknowledge that Plaintiffs complain of conduct occurring in this District as well as in the Northern District of Texas and elsewhere.

Defendants also minimize the significant national interests involved in consideration of the challenged immigration policies and guidelines promulgated by ICE and DHS officials in the District of Columbia. *Cruz v. Dep't of Homeland Sec.*, No. 19-cv-2727, 2019 WL 8139805 (D.D.C. Nov. 21, 2019), is instructive. In *Cruz*, the district court denied the government's motion to transfer a suit regarding the Migrant Protection Protocols to the Western District of Texas. Though those protocols were applied to plaintiff in Texas, the Court denied the motion to transfer the case because, among other things, "this case is not so limited in geographical scope as to implicate the local interests in deciding local controversies at home." *Id.* at *2. Similarly, this matter is not local in nature and transfer would not be proper.

### ii.    The relative congestion of the transferee and transferor courts

This Court has held that, in the absence of "a showing that the docket of either court is 'substantially more congested' than the other, this factor is neutral." *Gulf Restoration Network*, 87 F. Supp. 3d at 315 (citation omitted). Defendants argue that the dockets of this District and the

18

Northern District of Texas are congested, and that this factor "is neutral or, at best, only slightly moves the needle one way or another." (Doc. 16-1 at 17-19). Plaintiffs do not dispute this assertion.

### iii. The potential transferee court's familiarity with the governing law

In cases in which the plaintiff asserts federal claims requiring the "interpretation of federal law, '[t]he transferee district is presumed to be equally familiar with the federal laws governing [the plaintiff's] claims.'" *Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 335 (D.D.C. 2020) (alterations in original) (citation omitted). Defendants do not contest that the federal claims could be handled competently by a court in either district. With respect to Plaintiffs' federal claims, this factor is undisputedly neutral. *Aishat v. Dep't of Homeland Security*, 288 F. Supp. 3d 261, 269 (D.D.C. 2018).

Defendants take a different position with respect to Plaintiffs' FTCA claims. Defendants argue that this factor favors transfer of the case because Plaintiffs have asserted six tort claims that may apply Texas law. (Doc. 16-1 at 18). Defendants concede, as they must, that Plaintiffs assert three tort claims that may apply District of Columbia law, *id*. at 18 n. 2, but they do not admit that under their analysis the Northern District of Texas would be less familiar than this Court with applying District of Columbia law.

Nor do Defendants acknowledge that federal judges routinely apply the law of a state other than the state in which they sit. *See, e.g., Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 67–68 (2013) ("[F]ederal judges routinely apply the law of a State other than the State in which they sit. We are not aware of any exceptionally arcane features of Texas contract law that are likely to defy comprehension by a federal judge sitting in Virginia.").

Defendants identify no arcane features of Texas law that are likely to defy this Court's comprehension. Plaintiffs submit that the familiarity with the governing law factor is neutral.

Because a majority of factors either support maintaining venue in this District or are neutral, the Court should deny Defendants' Motion to Transfer Venue.

**II      The Court Should Allow Venue Discovery Before Transferring the Action.**

Alternatively, if the Court believes Plaintiffs have not sufficiently pled allegations to establish venue in this jurisdiction, Plaintiffs should be granted the opportunity to conduct venue-related discovery before transferring this action. Transferring this action before allowing venue-related discovery would reward the government's sword/shield approach: on the one hand, the government argues that Plaintiffs have not sufficiently alleged or shown conduct by D.C.-based officials, while on the other hand, it has withheld documents showing D.C.-based involvement that organizations working with Plaintiffs requested under FOIA nearly three years ago. *See Project S. v. U.S. Immigr. & Customs Enf.*, No. 1:21-cv-8440 (ALC) (BCM), 2024 WL 1116164, at *13-14 (S.D.N.Y. Mar. 12, 2024) (ordering additional searches and productions from entities within ICE and DHS headquarters).

This Court liberally grants such discovery to afford plaintiffs a reasonable opportunity to establish jurisdiction or venue. All that is needed is "a good faith belief that jurisdictional discovery will enable [plaintiff] to show that the court has personal jurisdiction" or venue "over the defendant." *Delta Sigma Theta Sorority, Inc. v. Bivins*, 215 F. Supp. 3d 12, 15-16 (D.D.C. 2013) (first alteration in original) (citation omitted) (granting jurisdictional and venue discovery in a trademark infringement case where the plaintiff alleged only that there was "at least one purchase of an allegedly infringing item by a District of Columbia resident"). This Court and others routinely grant jurisdictional discovery requests in the FTCA context. *See, e.g.*, *Wesberry v. United States,* 205 F. Supp. 3d 120, 135 (D.D.C. 2016) (allowing limited discovery in an FTCA action to address challenges to the application of exceptions to the FTCA); *Sledge v. United States*, 723 F. Supp. 2d 87, 94 (D.D.C. 2010) (allowing limited discovery in an FTCA action where the government

challenged the court's jurisdiction under the discretionary function exception). Indeed, in *F.C.C. v. United States*, the family separation case discussed *supra*, the court granted venue discovery and then relied on that discovery to approve transfer to this district because of the involvement of D.C.-based officials in relevant decision making. *F.C.C.*, 2023 WL 5718440, at *2.

Discovery is likely to show D.C.-based officials performed critical roles in the tortious conduct at issue here. Documents establishing D.C.-based officials' respective roles are uniquely in the government's control and have been withheld from Plaintiffs' counsel. Venue discovery based on the good faith showing here is appropriate and consistent with similar cases. *See Franz*, 591 F. Supp. at 378 (allowing venue discovery and subsequently holding that venue was proper in D.C. in an FTCA case where D.C. officials "retained overall responsibility for the administration of the" policies at issue made key decisions); *F.C.C.*, 2023 WL 5718440, at *2.

Plaintiffs' attorneys and organizations associated with Plaintiffs have diligently pursued through FOIA government records concerning Plaintiffs' treatment in detention, the wrongful use of restraints such as the WRAP, the decision to deport Plaintiffs to Cameroon, the decision to withhold medication, and other acts and decisions, as alleged in the Complaint. Organizations working with Plaintiffs submitted FOIA requests to (a) the Department of Homeland Security ("DHS"), (b) the Department of State ("State"), (c) Immigration and Customs Enforcement ("ICE"), and (d) the decision to use the WRAP, on April 26, 2021—three years ago—and have been diligently seeking responsive records since.

One FOIA request, the "Data Request," sought government records on the Cameroonians, including Plaintiffs, who had been deported, or whom the government sought to deport, as well as policy documents and planning documents, e.g., guidance and memoranda, informing how removal of Plaintiffs was executed for the period of August 1, 2020, to February 26, 2021. Zampierin Decl.,

Ex. B. A second request, the "Communications Request," sought government records concerning communications between and among the different government agencies involved in the removal flights and between U.S. government officials and the Honorary Consul of Cameroon Charles Greene. Zampierin Decl., Ex. C. Rather than provide timely and full responses, the government conducted inadequate searches and redacted key information from documents that have been produced. The government's non-compliance with FOIA obligations is the subject of the lawsuit styled as *Project South and Center For Constitutional Rights v. United States Immigration and Customs Enforcement, et al.*, Case No. 1:21-CV-8440 (ALC)(BM). *See* Zampierin Decl., Ex. A. On March 12, 2024, the U.S. District Court for the Southern District of New York ordered ICE and DHS to conduct additional searches for responsive documents within D.C.-based offices. *See Project S.*, 2024 WL 1116164, at *13-14.

ICE has produced some responsive government records, which are heavily redacted. ICE cites Exemptions (b)(6) (medical and personnel records) and (b)(7) (law enforcement purposes) for these redactions. *See* 5 U.S.C. §§ 552(b)(6) and (b)(7). Despite the redactions, the government records confirm D.C.-based officials actively participated in decisions about Plaintiffs' treatment. For example, government records include email threads concerning coordination of Plaintiffs' deportation flight and another deportation flight to Cameroon the following month. These emails show D.C.-based officials participated in preparing the manifest and other coordination tasks and in drafting and approving public statements about the flights. The produced documents have redacted the identity of the government official but what is readable includes a partial telephone number that has a District of Columbia area code ("202"). Thus, D.C.-based government officials appear to have participated in decisions about Plaintiffs' treatment.

As documented in more detail above, multiple emails confirm that D.C.-based DHS and ICE officials coordinated and approved the October and November 2020 deportation flights and other similar Special High Risk Charters. While many of the individuals and their titles cannot be determined because of the redactions, the records include evidence of the involvement of D.C.-based officers, including a Unit Chief, Zampierin Decl., Ex. D at 1028–30, Ex. F, at 996; an Embassy Liaison/Desk Officer, Ex. D at 1026–27; a Detention and Deportation Officer, Ex. E at 1002, 1004–06; and ICE's "very own ICE HRV Expert [redacted] from HQs." Ex. G, at 330–31. Policy documents confirm that headquarters officials are involved in coordinating ICE Air flights, and ICE's Removal and International Operations division coordinates Special High-Risk Charter Flights, such as the Plaintiffs'. *Id.*, Ex. H., at 7. And records from separate FOIA litigation suggest that a D.C.-based official made decisions to stay or go forward with the October 2020 deportations of individual Cameroonian migrants who had been a part of civil rights complaints based on whether ICE had categorized them as "Failure to Comply." *Id.*, Ex. I, at 0140–41; 0145–46.

Furthermore, with respect to The WRAP, CRCL has indicated that its investigation revealed deficiencies including "lack of policy, oversight, . . . [and] training," indicating that deficiencies may be attributable to D.C. headquarters. *Id.*, Ex. J, at 1. However, FOIA requests for CRCL's final report have resulted in materials with heavy redactions—including a report that redacts all of the relevant recommendations. *Id.*, Ex. K. Plaintiffs believe that discovery surrounding CRCL's investigation and other materials involving use of The WRAP would reveal additional acts and omissions in the District.

Plaintiffs request venue discovery here that would include full production of unredacted copies of documents pertaining to Plaintiffs' removal flights, use of The WRAP, and the circumstances of Plaintiffs' treatment while under the care and custody of the government under

Fed. R. Civ. Proc. 34. Such discovery is not a legally-recognized burden to the government, which was required to produce the documents under FOIA. 5 U.S.C. § 552. Plaintiffs are amenable to entering into an appropriate protective order that will limit use and publication of any sensitive information for purposes other than litigating the claims asserted in this lawsuit. *See* Fed. R. Civ. Proc. 26(c). Limited depositions and other written discovery would be tailored to determining the actions of D.C.-based officials in the relevant decisions and conduct that caused Plaintiffs' harm.

### III    The Court Should Not Dismiss Plaintiffs' Claims.

#### A.    Plaintiffs Have Exhausted Administrative Remedies.

The FTCA's exhaustion requirement, also referred to as presentment, 28 U.S.C. § 2675, is one of "notice of a claim for investigative purposes," not of proof. *GAF Corp. v. United States*, 818 F.2d 901, 922 (D.C. Cir. 1987). Ultimately, "[t]he standard for sufficient notice under the FTCA is minimal." *Tookes v. United States*, 811 F. Supp. 2d 322, 331 (D.D.C. 2011). Adequate presentment requires: "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim." *Id.* at 919. "In order to establish jurisdiction under the Act, a claimant must provide the agency with notice of a claim, not substantiate it to the agency's satisfaction." *Id.* at 917.

The purpose of the FTCA presentment requirement is to give the federal government the opportunity to investigate and settle FTCA claims prior to litigation. *GAF Corp.*, 818 F.2d at 918-19. Yet Defendants fail to recognize that the FTCA's presentment requirement is distinct from other statutory and common law exhaustion requirements.[13]

---

[13] Confusingly, Defendants point to inapplicable exhaustion standards in *Oglesby v. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990), *Hoeller v. Soc. Sec. Admin.*, 670 F. App'x 413, 414 (7th Cir. 2016), and *Taylor v. Appleton*, 30 F.3d 1365, 1369 (11th Cir. 1994), FOIA cases that do not address the FTCA presentment requirement and in *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995), a Title VII case discussing the EEOC exhaustion process.

24

In the FTCA context,"[t]he claimant need not even provide explicit notice to the government of all theories of liability underlying a claim, so long as the government's investigation of one claim revealed, or a reasonably prudent investigation would have revealed, other theories of liability." *Tookes*, 811 F. Supp. 2d at 331-32 (citing *Rise v. United States*, 630 F.2d 1068, 1071 (5th Cir. 1980) (concluding that written notice of one theory of liability based on a set of facts is sufficient to put an agency "on notice that its actions . . . were part of the chain of events" that resulted in the event that serves as the basis for the claim, and determining that if the "[g]overnment's investigation of the [plaintiff's] claim should have revealed theories of liability other than those specifically enumerated [in the administrative complaint,] those theories can properly be considered part of the claim" asserted in the plaintiff's judicial complaint); *Tsaknis v. United States*, 517 F. Supp. 2d 295, 299 (D.D.C. 2007) (adopting the *Rise* standard for assessing sufficient notice)).

The government first claims broadly that Plaintiffs did not exhaust claims outside of the Northern District of Texas. Doc. 16-1 at 1. Even a cursory review of the administrative complaints shows that this argument is disingenuous. R.N. was placed in The WRAP exclusively in Louisiana. (Doc. 1 ¶¶ 120-23.)

Plaintiff additionally exhausted each of the specific examples Defendant identifies as unexhausted claims.[14] The government first incorrectly argues that each plaintiff failed to raise claims involving inadequate medical treatment. Doc. 16-1 at 26. However, in K.N.N.'s administrative complaint, K.N.N. alleged that he suffered both mental and physical harm while

---

[14] Defendant identifies some examples that do not form the basis of Plaintiffs' tort claims, but merely provide background information. K.N.N. is not seeking tort damages for being provided incorrect mailing information for his appeal to the Fifth Circuit, Doc. 16-1 at 26; he provided this information as part of the history of his immigration proceedings. C.M. is not seeking tort damages for being placed in isolation due to COVID-19; he provided this information as part of his mental and physical health history. *See* Doc. 16-1 at 26.

detained in the United States. (Doc. 16-2 at 7). Further, K.N.N. alleged that while detained in the United States, he suffered from gastrointestinal bleeding and anemia, and he noted at the top of his attachment that the incident included "medical negligence in the preceding months" before his deportation. *Id.* Similarly, R.N. also explicitly noted that the complaint included medical negligence in the months before his deportation. (Doc. 16-3 at 6). RN's administrative complaint details that RN experienced chest pain, needed anxiety medication, and suffered from joint pain in his feet and knees prior to being placed in the WRAP. (*Id.* at 7.) C.M. began his administrative complaint addendum noting that C.M. suffers from asthma and required the use of an inhaler while in ICE detention. (Doc. 16-4 at 6). He clearly asserted that he "suffered hearing loss in detention that was never properly treated." (*Id.* at 7.) Finally, E.U. discussed his heart conditions, including previous heart attack and the stent inserted for coronary heart disease, in his administrative complaint. (Doc. 16-5 at 6.) His complaint contains language about medical neglect at Etowah Detention Center that mirrors the language that the government complains was not exhausted. *Compare* Doc. 1 at ¶ 65 *with* Doc. 16-5 at 6 (noting "depression, gastrointestinal reflux, hypertension, and coronary heart disease"). Immediately after this statement, the complaint raises claims of "medical negligence" for "inadequate, substandard medical care and supervision provided by physicians and other health care providers." (Doc. 16-5 at 6.) In fact, each Plaintiff raises uses almost identical language to raise "medical negligence" in each of their administrative complaints. (Doc. 16-2 at 8; Doc. 16-3 at 8; Doc. 16-4 at 8).

Second, the government takes issue with claims about excessive force for K.N.N and C.M. in Louisiana. But both Plaintiffs have raised these claims as part of the "chain of events" leading to ICE officers identifying them for the unnecessarily harsh WRAP restraint. *Rise*, 630 F.2d 1068, 1071 (5th Cir. 1980). Like the Plaintiff in *Rise*, Plaintiffs' allegations put the government on notice

of related uses of force because of the transfers and other preparations for deportation. *Id.*; *see also* Doc. 1 at 21 (identifying these incidents as "use of force and threats in the days prior to deportation flights); ¶¶ 93–96 (detailing how force was used after K.N.N. asked where he was being taken, and immediately before his transfer to Prairieland for deportation); ¶¶ 101–05 (detailing how force was used to facilitate his removal and immediately prior to transfer to Prairieland for deportation).

Finally, the government argues that K.N.N. failed to raise claims about being held naked in a solitary cell at La Salle Detention facility. But K.N.N. stated that he had been "placed in isolation under suicide watch," which was the same incident. (Doc. 16-2 at 7.)

Furthermore, presentment does not require plaintiffs to provide information likely already in the agency's possession; courts consider the information available to the agency. *See, e.g.*, *Rise*, 630 F.2d at 1071 ("[T]he Army's investigation of the death should have produced ... evidence that [the hospital's] facilities may have been inadequate. . . and, consequently, that referring Mrs. Rise there might have been negligence."); *Burchfield v. United States*, 168 F.3d 1252, 1256-57 (11th Cir. 1999) (finding that the plaintiff, in his administrative FTCA complaint, had given Veterans Affairs "sufficient information, including the dates of his treatment and the names of his doctors, to allow the VA *to refer to the medical records in its possession to investigate*" (emphasis added)); *Collins v. United States*, 996 F.3d 102, 112 (2d Cir. 2021); *Johnson by Johnson v. United States*, 788 F.2d 845, 849 (2d Cir. 1986) ("[A] reasonably thorough investigation of the incident should have uncovered any pertinent information in the government's possession relating to the agency's knowledge, or lack of knowledge, of any prior sexual misconduct by its employee. . . .."), *cert. denied*, 479 U.S. 914 (1986), *overruled on other grounds sub nom. Sheridan v. United States*, 487 U.S. 392 (1988).

Here, Defendants had access to detention facility records, such as housing unit logs, ICE reports and records, and the Plaintiffs' full immigration proceedings and medical and detention files. ICE's own policies require ICE to maintain: records of "routine unit operations, as well as unusual and emergency incidents" in housing unit logs; records of "the circumstances related to a detainee's confinement to the [the special management unit ("SMU"), otherwise known as segregation or solitary confinement], through required permanent SMU logs and individual detainee records"; "documentation (e.g., audiovisual recording for calculated use of force), reporting and an after-action review . . . for each incident involving use of force," which also includes documentation of a required medical examination after use of force; and "a complete health record on each detainee." ICE Performance-Based National Detention Standards 2011, rev. 2016, § 2.4, at 86; *id.* at § 2.12, at 172, 179-80; *id.* at § 2.15, at 202, 206-07; *id.* at § 4.3, at 277.[15] They also had access to CRCL complaints and other complaints about the forced fingerprinting suffered by both R.N. and C.M. in Adams County and Jackson Parish. (Doc. 1 ¶¶ 72-83, 99, 104.) A reasonably thorough investigation of the evidence required to be in ICE's possession would have uncovered details on each use of force incident, the medical treatment Plaintiffs did and did not receive at each facility, and K.N.N.'s isolation.

### B. Plaintiffs Have Adequately Pled D.C.-Based Torts.

The government moves to dismiss all D.C.-based torts based on arguments that largely mirror its venue arguments. (Doc. 16-1 at 26-31). Primarily, the government argues that Plaintiffs have not pled sufficient information to conclude that the actions or omissions of D.C.-based officials give rise to the torts at issue. But the question of which state law applies to Plaintiffs' underlying claims must be answered through a choice-of-law analysis. As Plaintiffs have raised

---

[15] *Available at* https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf.

plausible allegations that relevant acts or omissions occurred in D.C., this analysis should not be done based on the pleadings, but rather done after discovery when Plaintiffs have had an opportunity to learn which officials were involved in which decisions. Even if the government were correct that now is the proper time to move to dismiss the D.C.-based torts, Plaintiffs have pled sufficient facts to state a claim on each of the identified claims: abuse of process, intentional infliction of emotional distress ("IIED"), and negligent supervision.

> **1.  A Choice-of-Law Analysis Will Determine whether D.C. Law or Another State's Law Should Apply, and this Analysis Is Properly Made After Discovery.**

A choice-of-law analysis determines which state's substantive law governs for claims under the FTCA. The FTCA specifies that the government's liability is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The Supreme Court has interpreted this language to mean that courts must determine "where the act or omission occurred" and then apply the "whole law" of that jurisdiction, including choice of law rules. *Richards v. United States*, 369 U.S. 1, 6-8 (1962); *see also Hitchcock*, 665 F.2d at 359.

*Richards* involved only one negligent act, and the Supreme Court did not address how a court should determine choice of law in cases involving multiple acts in different states. This Court and others have determined that the following analysis should apply: if a conflict exists between the possible state choice of law provisions, a court must *first*, select between the states' respective choice of law provisions, and *second*, apply that state's choice of law provision to determine which state's substantive tort law governs. *See Raflo v. United States*, 157 F. Supp. 2d 1, 8 (D.D.C. 2001).

The government does not attempt to engage in this conflict of law analysis, and an initial peek demonstrates why discovery is needed to do so. As to the threshold question, the choice of

law provisions differ in the states where Plaintiffs' alleged actions occurred on their face.[16] It is unclear whether the Texas, Louisiana, Mississippi, Florida, and D.C. choice of law provisions would reach different results without more details about the locations where the government made decisions and gave instructions on issues such how to treat Plaintiffs during deportation.

In determining which state's choice of law provision should apply, the D.C. Circuit requires courts to look to where the "relevant" act or omission occurred—which can include the acts of higher-level officials who caused the injuries through improperly supervising and directing lower-level officers. *See Hitchcock*, 665 F.2d at 359 (applying D.C. choice of law rules where plaintiff was injured by a vaccine administered in Virginia, because the nurse's failure to warn plaintiff of the risks of the vaccine was attributable to failures of officials in the District to develop a protocol to administer the vaccine and provide supervision and direction); *see also Raflo*, 157 F. Supp. 2d at 9. While Plaintiffs have raised plausible allegations of D.C. officers' involvement in the relevant acts or omissions, the government has not allowed Plaintiffs to access relevant documents or other resources that would allow them to better understand the timeline and relevant decision making, especially during the weeks leading up to Plaintiffs' transfers to multiple facilities and deportation.

---

[16] D.C. uses the "governmental interests" analysis approach, but applies a two-step inquiry: 1) identifying the governmental policies underlying the applicable laws; and 2) determining which state's policy would be most advanced by having its law applied to the facts of this case. In the latter inquiry, D.C. courts look to factors enumerated in the Restatement (Second) of Conflict of Laws § 145: 1) the place where the injury occurred; 2) the place where conduct causing the injury occurred; 3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and 4) the place where the relationship is centered. *See Raflo*, 157 F. Supp. 2d at 5.

    Louisiana, on the other hand, assesses the "government interest" test in a different way, looking first to the strength and pertinence of the relevant policies of the involved states in light of the four factor Restatement test enumerated above, as well as (1) the relationship of each state to the parties and the dispute; (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state; and (3) policies of deterring wrongful conduct and of repairing the consequences of injurious acts. La. Civ. Code art. 3542, 3515.

    And Texas and Mississippi apply the "most significant relationship" test by applying the Restatement factors. *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000); *McDaniel v. Ritter*, 556 So. 2d 303, 310 (Miss. 1989).

Thus, the question of which action was "relevant" to the claims at issue is difficult to determine at this stage without knowing the precise nature of any guidance and higher-level decision making.

Indeed, courts, including this one, have deferred ruling on motions to dismiss that depend on a conflict of law analysis until after discovery if there are not sufficient facts at the pleading stage to complete the analysis. *See, e.g.*, *Maynard v. Melton*, No. CV1702612KBJRMM, 2021 WL 6845008, at *11 (D.D.C. Apr. 7, 2021) (citing cases), *report and recommendation adopted*, No. 1:17-cv-02612 (JMC), 2023 WL 1963919 (D.D.C. Feb. 10, 2023). At this stage, Plaintiffs have alleged that D.C. officials knew about the abuse, raising concerns about their role in authorizing or sanctioning the behavior. D.C. officials knew about the abuse at Adams County and Jackson Parish about forced fingerprinting involving Plaintiffs and about other abuse of Cameroonians immediately before the deportation flights; they were involved in decisions to transfer Plaintiffs to different facilities and coordinate their removal flights, and classified these flights as "Special High Risk Charters" requiring a special SWAT team to be placed on these flights that applied The WRAP. Additional discovery can determine the precise nature of the communications and instructions that flowed from each of these decisions.

At this stage, it is plausible both that "relevant" actions relating to each of the injuries occurred in D.C.—requiring application of D.C. choice of law rules, *Hitchcock*, 665 F.2d at 359— and that under either of the states' choice of law rules, application of the government interest or most significant relationship tests may require D.C. law to be applied on some or all claims. What is clear is that the question of whether D.C. law applies does not turn solely on whether Plaintiffs have alleged that any "D.C.-based" federal employee themselves completed each of the actions that are required for government liability. (Doc. 16-1 at 28-31). Thus, the government's motion to dismiss these claims on this basis must be denied.

2.    **Plaintiffs Plausibly Allege that Law Enforcement Officers Committed Abuse of Process and Intentional Infliction of Emotional Distress.**

The government claims that the abuse of process and IIED claims under D.C. law are shielded by sovereign immunity because Plaintiffs did not allege that "D.C.-based government officials were carrying out investigative or law enforcement officer functions." (Doc. 16-1 at 27-28). But this argument both misunderstands the choice of law question, as noted above, and misstates the scope of the law enforcement proviso that allows the United States to be sued for intentional torts. Even if the Court is inclined to consider the government's motion to dismiss D.C.-based torts without discovery, dismissal is inappropriate here. Plaintiffs clearly alleged that law enforcement officers were involved in the actions at issue, and Plaintiffs have furthermore raised a plausible allegation that even the relevant D.C.-based officers are law enforcement officers.

Though the FTCA preserves the United States' sovereign immunity for certain intentional torts, the so-called law enforcement proviso waives that immunity for six intentional torts arising from the acts or omissions of federal "investigative or law enforcement officers." 28 U.S.C. § 2680(h).[17] The proviso defines an investigative or law enforcement officer as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* The Supreme Court has confirmed that "Congress intended immunity determinations to depend on a federal officer's legal authority, not on a particular exercise of that authority." *Millbrook v. United States*, 569 U.S. 50, 56 (2013). Thus, any act or

---

[17] Intentional infliction of emotional distress is not expressly enumerated as a tort for which the U.S. retains sovereign immunity under § 2680(h), and thus courts have allowed such claims to proceed regardless of whether or not the actions were taken by law enforcement. *See, e.g.*, *Santiago–Ramirez v. Sec'y of Dep't of Def.*, 984 F.2d 16 (1st Cir. 1993); *Dickey v. United States*, 174 F. Supp. 3d 366, 374 (D.D.C. 2016); *see also Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 540 (D.C. Cir. 1977) (reading the exception to liability in § 2680(h) narrowly to reach only the enumerated torts). However, even if Plaintiffs' claims for intentional infliction of emotional distress are covered by § 2680(h) because they "aris[e] out of" an enumerated claim like assault, battery, or abuse of process, such claims would also be subject to the law enforcement proviso, which uses the same "arising . . . out of" language. As detailed herein, Plaintiffs sufficiently allege that these claims are based on the acts of law enforcement officers.

omission committed by investigative or law enforcement officers in the scope of their employment triggers the proviso's waiver of sovereign immunity, even if the officers were not exercising their arrest or investigative powers in that moment. *Id.*

Many DHS and ICE officers are properly considered "law enforcement officer[s]" based on their power to arrest. Congress has given the Secretary of Homeland Security the powers to enforce immigration laws, to make arrests, and to delegate this authority to other employees. 8 U.S.C. §§ 1103, 1357(a).  The Secretary has in turn delegated such power, including the power to arrest and conduct searches, to various immigration officials, including "deportation officers," "special agents," and "supervisory and managerial personnel who are responsible for supervising the activities of those officers." 8 C.F.R. § 287.5(c)–(d). Accordingly, courts have held that immigration officers qualify as investigative or law enforcement officers. *E.g.*, *Watson v. United States*, 865 F.3d 123, 133–34 (2d Cir. 2017) (citing *Liranzo v. United States*, 690 F.3d 78, 91 (2d Cir. 2012)); *Medina v. United States*, 259 F.3d 220, 224 (4th Cir. 2001). Indeed, the government routinely relies on the Freedom of Information Act's law enforcement exemption to shield documents generated by immigration officials from public disclosure, including documents related to the Plaintiffs' deportations. *See Project S. v. U.S. Immigr. & Customs Enf.*, No. 1:21-cv-8440, 2024 WL 1116164, at *13-14 (S.D. N.Y. Mar. 12, 2024).

The government does not contest that Plaintiffs allege that law enforcement officers committed the core activities comprising Plaintiffs' abuse of process and intentional infliction of emotional distress claims. Plaintiffs claim that immigration officers used unlawful force, withheld medical treatment and drinking water, punitively weaponized solitary confinement, and utilized verbal abuse as retaliation for hunger striking in a manner that constitutes abuse of process and intentional infliction of emotional distress. (*e.g.* Doc. 1 ¶¶ 72, 216, 210, 245). This is sufficient to

find that Plaintiffs have satisfied the law enforcement proviso for their abuse of process and IIED claims, and the question of whether D.C. law applies can be resolved at a later date rather than dismissing the claim. *See supra* Part III.B.1.

However, even if Plaintiffs were required to allege that the acts or omissions *in D.C.* were performed by a law enforcement officer, their complaint also contains sufficient allegations on this point. Plaintiffs have plausibly alleged that D.C. officials knew about the abuse of Cameroonians in the detention centers, did not intervene to stop or rectify the behavior, and instead scheduled the Plaintiffs for deportation flights they designated as "Special High Risk Charters," placing a special operations team on those flights that often threatened and used The WRAP restraint on individuals being deported and denied them medical treatment. Though the details of orders and instructions coming directly from D.C. have not been discovered at this point, Plaintiffs have plausibly alleged that D.C. officers were involved in these coordinated efforts, including transferring Plaintiffs across multiple states and detention centers, and overseeing use of The WRAP. (*e.g.* Doc. 1 ¶¶ 2, 10, 72-74, 93-105). It is reasonable to believe that these officers were operating as supervisory law enforcement officers under the statutory and regulatory authority noted above.

Finally, the government's motion to dismiss only the D.C.-based torts is better understood as either a choice of law question or an attack on venue.  As explained in more detail in Parts II and III.B.1, Plaintiffs further request the opportunity for limited discovery to determine if the D.C.-based DHS and ICE officials involved in this case had the appropriate authority to search, seize, or arrest. Based on the limited evidence Plaintiffs have been able to uncover to date, they believe this discovery will show involvement by D.C. officials in the relevant actions.[18]

---

[18] As identified above, the records Plaintiffs have been able to obtain to date include evidence of the involvement of D.C.-based officers who likely have arrest powers, including a Unit Chief over Enforcement and Removal Operations within ICE, Zampierin Decl., Ex. D at 1028–30, Ex. F, at 996, and a Detention and Deportation Officer, Ex. E at 1002, 1004–06.

### 3.    Plaintiffs Have Stated a Claim for Abuse of Process.

The government argues that Plaintiffs' abuse of process claim under D.C. law should be dismissed because Plaintiffs have not identified any "D.C.-based actor" that engaged in abuse of process. Plaintiffs maintain that these arguments are better directed at a later choice of law analysis, *supra* Part III.B.1; nevertheless, the government's argument also fails because Plaintiffs have stated a claim for abuse of process under the elements of D.C. law.

To prevail on a claim for abuse of process in D.C., plaintiffs must establish: "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge.'" *Thorp v. District of Columbia*, 319 F. Supp. 3d 1, 22 (D.D.C. 2018) (quoting *Hall v. Hollywood Credit Clothing Co.*, 147 A.2D 866, 868 (D.C. 1959)).

Plaintiffs have met this standard. Plaintiffs have alleged that Defendants perverted the process that allowed Plaintiffs' detention[19] "for the unlawful purposes of traumatizing Plaintiffs . . . to abandon their lawful asylum, Convention Against Torture ("CAT"), parole, and custody review claims and deterring future Cameroonian migrants from seeking refuge in the United States." (Doc. 1 ¶ 215). *See Scott v. District of Columbia*, 101 F.3d 748, 756 (D.C. Cir. 1996) (perversion of the judicial process requires some "collateral purpose," such as "pressur[ing] [plaintiffs] into taking any action or prevent[ing] him from taking [an action]"). Plaintiffs allege that the government tried to coerce their fingerprints in an attempt to force them to voluntarily accept removal from the

---

[19] Plaintiffs' detention in this case is properly considered "process," as it was done pursuant to their removal proceedings. *See Spiller v. District of Columbia*, 362 F. Supp. 3d 1, 7 (D.D.C. 2019) ("warrantless arrests and detentions effectuated entirely *independent* of the judicial process [do] not support an abuse of process tort." (citation omitted)); *McCarthy v. Kleindienst*, 741 F.2d 1406, 1414, 1441 n.9 (D.C. Cir. 1984) (distinguishing those subject to detention effectuated outside of the judicial process, who could not bring claims for abuse of process, from other victims of unlawful arrest that "had judicial process invoked against them").

country (Doc. 1 ¶¶ 76, 97–99, 101-05) and used The WRAP to threaten Plaintiffs and others and stop them from raising questions about their pending claims (*id.* ¶¶ 37, 123).

These abuses are not proper in the regular course of detention. Moreover, Plaintiffs have alleged that D.C.-based officials were involved in the relevant detention and deportation decisions.

Plaintiffs also do not need to plead that officers were successful in accomplishing these ulterior motives. There is no requirement that defendant "have fully achieved his ulterior goal," but instead plaintiffs must show only that the defendant "succeeded in deliberately causing collateral damage . . . as part of their scheme." *Whelan v. Abell*, 953 F.2d 663, 670–71 (D.C. Cir. 1992). The physical and mental abuse Plaintiffs suffered due to officers' intentional and unlawful actions was collateral damage that is improper and unintended in the regular course of detaining individuals seeking immigration relief. (Doc. 1 ¶ 216.).

### 4. Plaintiffs Have Stated a Claim for Intentional Infliction of Emotional Distress.

Plaintiffs have pled sufficient facts to survive Defendants' motion to dismiss their IIED claims under D.C. law. In order to prove the tort of IIED under D.C. law, "a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Baltimore v. District of Columbia*, 10 A.3d 1141, 1155 (D.C. 2011) (citation omitted).

Defendants' arguments merge into a single assertion that none of Plaintiffs' allegations "against D.C.-based officials" constitute "outrageous and extreme" conduct. (Doc. 16-1 at 29-30). Defendants do not raise arguments related to the second and third elements of an IIED claim under D.C. law; nor do they argue that the conduct by officials *outside of D.C.* did not rise to the level of "extreme and outrageous." Plaintiffs have explained why these arguments about the application of D.C. law should be determined through a choice of law analysis after discovery. *Supra* Part III.B.1.

However, even considering the government's arguments on this claim directly, Plaintiffs have alleged sufficiently outrageous and extreme actions by ICE and DHS employees, including some based in D.C.

In assessing an IIED claim, "Liability will be imposed only for conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious' and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1996) (citation omitted), *opinion amended*, 720 A.2d 1152 (D.C. 1998). In order to establish "extreme and outrageous conduct," a plaintiff must show that "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 817 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). "[I]n determining whether the conduct complained of is 'extreme and outrageous,' the court must consider 'the specific context in which the conduct took place.'" *Est. of Underwood v. Nat'l Credit Union Admin.*, 665 A.2d 621, 641 (D.C. 1995) (citation omitted). A court should examine, "not only . . . 'the nature of the activity at issue' but also . . . '*the relationship between the parties*, and the particular environment in which the conduct took place.'" *Id.* (citation omitted). One identified hallmark of extreme and outrageous conduct in analyzing IIED claims is "abusing a position of authority over another." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 164 (D.C. 2013); *see also Drejza v. Vaccaro*, 650 A.2d 1308, 1309–10, 1314 (D.C. 1994) ("Outrageous conduct may consist of '[the] abuse of [a] position of authority, particularly by, *inter alia*, police officers.'" (alteration in original) (citation omitted)).

Plaintiffs have alleged facts that plausibly state a claim that officials engaged in "extreme and outrageous" conduct under D.C. law. In response to Plaintiffs' and other Cameroonians' participation in peaceful protests and CRCL complaints, D.C.-based officials scheduled "Special

High Risk" deportation flights involving a special SWAT team known to threaten and use The WRAP. (Doc. 1 ¶ 88.)  In the course of deporting Plaintiffs, ICE officers subjected them to threats and unwarranted, severe physical abuse to secure their fingerprints on deportation-related documents. (*Id.* ¶¶ 95, 98, 103.) In the process of boarding ICE Air flights, officials restrained Plaintiffs in The WRAP and left them confined in the device for hours in an acute angle stress position, causing excruciating pain and severe medical consequences (*e.g.*, Doc. 1 ¶¶ 37, 106-47). D.C.-based officials had knowledge of Plaintiffs' and other Cameroonians' participation in the protests and likely coordinated their retaliatory mistreatment and deportation to Cameroon. (Doc. 1 ¶¶ 78, 83-92); Zampierin Decl. Exs. D-I. The fact that officers did not abide by relevant policies, including ICE's own policy on use of force and manufacturer's guidelines for The WRAP,[20] indicate that this conduct qualifies as "outrageous" in context. *See Jones v. District of Columbia*, No. 21-836 (RC) 2021 WL 5206207 (D.D.C. Nov. 9, 2021) (finding that the plaintiff's allegations suffice to plead that a police officer's harassment and physical conduct, unrelated to any legitimate police interest, were extreme and outrageous in context). The conduct of D.C.-based officials, who had supervisory powers and complete custody and control over Plaintiffs, represents an "abus[e of] a position of authority over another." *Ortberg*, 64 A.3d at 164.

The conduct cannot be construed as "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Doc. 16-1 at 29 (citing *District of Columbia v. Tulin*, 994 A.2d 788, 800 (D.C. 2019))). Rather, officials, including some likely based in D.C., engaged in a systematic campaign to terrorize, intimidate, punish, and ultimately deport Plaintiffs following their and other Cameroonians' participation in protests and Plaintiffs' perceived noncompliance. *See Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 935 (D.C. 1995) (finding evidence of

---

[20] (Doc. 1 ¶¶ 148-53; 156–72.)

systematic efforts to harass and intimidate the tenants was extreme and outrageous), *opinion amended on denial of reh'g*, 681 A.2d 1097 (D.C. 1996).

As a result of these acts, Plaintiffs have experienced symptoms of emotional distress and psychological harm. (*e.g.*, Doc. 1 ¶¶ 132, 184, 223). Because Plaintiffs have alleged sufficient facts to establish all three elements of an IIED claim under D.C. state law, Plaintiffs IIED claims survive Defendants' motion to dismiss.

### 5.       Plaintiffs Have Stated a Claim for Negligent Supervision.

Likewise, Plaintiffs have pled sufficient facts to survive Defendants' motion to dismiss their negligent supervision claims against D.C.-based officials. The government argues that Plaintiffs "fail to allege that any D.C.-based actor breached a duty of care owed to Plaintiffs" and that the conduct alleged by Plaintiffs "is an act or omission that occurred where the subordinate employees allegedly engaged in tortious behavior—that is, in the case of the use of the WRAP on Plaintiffs, . . . the Northern District of Texas." (Doc. 16-1 at 30.) Both arguments fail.

First, Plaintiffs sufficiently allege that D.C.-based officials breached a duty owed to Plaintiffs. In order to demonstrate the tort of negligent supervision under D.C. law, a plaintiff must "show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Katz v. District of Columbia*, 285 A.3d 1289, 1317 (D.C. 2022) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)); *Blair v. District of Columbia*, 190 A.3d 212, 229 (D.C. 2018). Further under D.C. law, Defendant can be held liable for negligent supervision if it is "negligent or reckless . . . in giving improper or ambiguous orders o[r] in failing to make proper regulations; or. . . in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon

39

premises or with instrumentalities under his control." *District of Columbia v. Tulin*, 994 A.2d 788, 795 (D.C. 2010) (second alteration in original).

As government employees in supervisory roles, D.C.-based officials have a duty to properly supervise ICE agents and other detention officers and to oversee their treatment of individuals in immigration custody. *See United States v. Shearer*, 473 U.S. 52, 56 (1985) (plurality opinion) (finding that the United States may still be liable under the FTCA if a federal employee fails to prevent tortious conduct by contract employees acting under federal supervision). D.C.-based supervisory officials were aware of the abusive tactics ICE agents and other officers at Pine Prairie, Jackson Parish, and Adams County weaponized against Plaintiffs in detention and during the deportation process, which had been well-documented in the press, multiple reports to oversight agencies, and inquiries by politicians. (Doc. 1 ¶¶ 12, 72-83, 99, 104, 174-184); *see, e.g.*, *James v. District of Columbia*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) (finding a plaintiff adequately stated a claim of negligent supervision based on systemic issues within the Metropolitan Police Department). CRCL had documented multiple incidents of abuse in detention facilities and on ICE Air Flights. (*Id.* ¶¶ 174-184.) They also had duties to enact proper policies, oversight, and training for new restraint devices like The WRAP, as it appears CRCL has found in their own investigation of Plaintiffs' allegations. Zampierin Decl. at J, K.

D.C.-based officials' negligent supervision proximately caused the unlawful conduct and injury that Plaintiffs experienced at in detention and during the deportation process to occur. Here, ICE agents and officers under the supervision of D.C.-based officials failed to exercise adequate care in restraining Plaintiffs, including using unlawful force and The WRAP, and  failed to provide Plaintiffs with appropriate medical care. In doing so, Defendants violated non-discretionary, mandatory agency obligations under ICE's detention standards, including ICE's own policy on use

of force, which, among other things, allows use of force and restraints only when necessary and reasonable; requires restraints to be applied for the least amount of time necessary; prohibits the use of restraints to cause physical pain or extreme discomfort; and requires medical assessment either prior to the use of force or immediately to determine any necessary care. (Doc. 1 ¶¶ 156–72). D.C.-based officials' failure to adequately supervise their own direct employees, as well as their failure to adequately supervise detention center contract employees, resulted in severe physical injuries, emotional distress, and inhumane treatment. Plaintiffs have thus pled sufficient facts to plausibly establish that the actions of D.C.-based supervisory employees constituted negligent supervision under D.C. law.

Second, Defendants' negligent supervision of its employees, the officials who harmed Plaintiffs, occurred in this District, not in the Northern District of Texas. The locus of the negligent acts and omissions is in D.C., where the Defendant agencies are headquartered, train and supervise their employees, and develop policies and procedures pertaining to the treatment of individuals in immigration custody. *See Hitchcock*, 665 F.2d at 359–60 (finding that in a negligent supervision claim, the relevant "act or omission" took place in D.C., where the defendant agency was headquartered and the relevant procedures were formulated, not in Virginia, where the vaccine causing the injury was actually administered). As argued previously, *supra* Part III.B.1, the government's arguments are properly addressed by a choice of law analysis, where the applicable law is that of "the jurisdiction where the negligence took place, not where it had its 'operative effect.'" *Richards*, 369 U.S. at 9.

### C.    Plaintiffs' APA Claims Are Not Foreclosed.

The government argues that Plaintiffs' final two counts, APA claims under the *Accardi* doctrine for DHS and ICE's failure to follow their own policies, are precluded because the FTCA provides an adequate remedy. But their argument misstates the nature of Plaintiffs' APA claims—

which are directed at DHS and ICE's failure to follow their own binding policies regarding confidentiality, removals, use of force, segregation, and healthcare—and ignores the text and purpose of both the FTCA and APA.

Section 704 of the APA limits the availability of APA claims and judicial review of agency action to instances where "there is no other adequate remedy in a court." 5 U.S.C. § 704. In determining whether another statute affords such an "adequate remedy," courts must proceed cautiously so as not to "defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903–04 (1988). "The Supreme Court long instructed that . . . 'only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (quoting *Abbott Lab'ys. v. Gardner,* 387 U.S. 136, 141 (1967), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

Determining the scope of the alternative remedy is thus crucial to the inquiry, and courts must assess whether that alternative scheme provides an independent cause of action or an alternative review procedure. *El Rio Santa Cruz*, 396 F.3d at 1270. "Succinctly put, where a statute affords an opportunity for *de novo* district-court review, the court has held that APA review was precluded because 'Congress did not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously both [the review provision] and the APA.'" *El Rio Santa Cruz*, 396 F.3d at 1270 (*quoting Env't Def. Fund v. Reilly*, 909 F.2d 1497, 1501 (D.C. Cir. 1990) (alterations in original) (citation omitted). Where *de novo* review of agency action is unavailable, an alternative remedy cannot be adequate if it offers only "doubtful and limited relief," and instead must "offer[]

relief of the 'same genre'" as the APA. *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citations omitted).

The government does not argue that the FTCA provides an opportunity for *de novo* review of agency action, and it is clear that it does not. Nor is there "clear and convincing" evidence that Congress intended the FTCA to supplant any APA claims. *Abbott Lab'ys*, 387 U.S. at 141 (citation omitted)*; Garcia*, 563 F.3d at 523. A close look at the FTCA makes this evident.

Congress clearly delineated in the FTCA, including the 1988 amendments (known as the "Westfall Act"), the particular instances in which the FTCA should be seen as an exclusive remedy. 28 U.S.C. 2679(a)-(b). Most relevant to the APA claims against DHS and ICE is subsection (a) of that provision, which governs claims against administrative agencies: "[t]he authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive." 28 U.S.C. § 2679(a). The Supreme Court construed this provision narrowly in *F.D.I.C. v. Meyer*, where it held that the FTCA is the exclusive remedy *only* for claims that fit all six elements required for an FTCA claim:

> [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994) (alterations in original) (quoting 28 U.S.C. § 1346(b)). The plaintiff in *Meyer* asserted a constitutional tort under federal law against the defendant agency, and thus failed to meet the sixth element. *Id.* As a result, the Court concluded that "the FTCA does not constitute [Plaintiff's] 'exclusive' remedy." *Id.* at 478.

Similarly here, Plaintiffs' APA claims do not fit the six elements. Like the plaintiff in *Meyer*, the basis for their claims is federal law, and specifically the agency's failure to follow its own rules and regulations under the *Accardi* doctrine. Additionally, Plaintiffs here do not seek damages with their APA claims, but rather injunctive and declaratory relief, and therefore their claims fail to meet the FTCA's second element as well. Thus, the FTCA does not provide an alternative remedy, or any relief of the "same genre" as the equitable and injunctive relief available under the APA. *Garcia*, 563 F.3d at 522 (citation omitted).

The Westfall Act, enacted in 1988, also added provisions that deem the FTCA damages remedies to be exclusive in personal injury or property loss actions "for money damages" against an employee of the government. 28 U.S.C. § 2679(b)(1). The exclusiveness provision does not apply to an action brought pursuant to any separately-authorized statute that authorizes such an action. *Id.* § 2679(b)(2). Rather, these amendments to the FTCA were narrowly tailored to "return Federal employees to the status they held prior to the *Westfall* decision" by making clear that individual employees would not be subject to damages lawsuits for actions taken in the scope of their employment. *De Martinez v. Lamagno*, 515 U.S. 417, 426 (1995) (citation omitted). The House Report also makes it clear that these amendments were not intended to abrogate existing causes of action for injunctive relief, such as the APA:

> The technical amendment to amend section 2679(b)(1) of title 28 makes it clear that an injured person retains the right to seek injunctive or other appropriate equitable relief against either the United States or the Federal employee. The technical amendment to amend section 2679(b)(2) of title 28 makes it clear that the changes made by this Act do not alter either express or implied statutory rights of action for injunctive relief or damages . . . . Clearly, H.R. 4612 does not change the law, as interpreted by the courts, with respect to the availability of other recognized causes of action; nor does it either expand or diminish rights established under other Federal statutes. . . . [N]o one who previously had the right to initiate a lawsuit will lose that right.

H.R. Rep. No. 100–700, p. 7.

Thus, Congress clearly did not intend for the FTCA to be an adequate alternative remedy for the APA, and Defendants' arguments fail.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Transfer and Dismiss. Plaintiffs request all such other and further relief, at law or in equity, to which they may show themselves justly entitled.

Dated: May 20, 2024

*Respectfully submitted,*

/s/Ronald L. Raider

Samah Mcgona Sisay (D.D.C. Bar # NY0567)
Baher Azmy*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10007
Tel: 212-614-6484
E: ssisay@ccrjustice.org
E: bazmy@ccrjustice.org

Caitlin J. Sandley (admitted *pro hac vice*)
CENTER FOR CONSTITUTIONAL RIGHTS
P.O. Box 486
Birmingham, AL 35201
Tel: 212-614-6443
E: csandley@ccrjustice.org

William Alan Wright (admitted *pro hac vice*)
John D. Robinson (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX USA 75201
Tel: 214-922-7131
Tel: 214-922-7151
E: alan.wright@ktslaw.com
E: john.robinson@ktslaw.com

Dustin T. Greene (NC Bar No. 38193)*
Jason M. Wenker (NC Bar No. 36076)*
Elizabeth L. Winters (NC Bar No. 44918)*

KILPATRICK TOWNSEND & STOCKTON LLP
1001 West Fourth Street
Winston-Salem, NC 27101
Tel: 336-607-7432
Tel: 336-607-7416
Tel: 336-607-7345
E: dgreene@ktslaw.com
E: jwenker@ktslaw.com
E: bwinters@ktslaw.com

Ronald L. Raider (DC Bar No. 412978)*
Amanda Brouillette (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA USA 30309
Tel: 404-532-6909
Tel: 404-685-6775
E: rraider@ktslaw.com
E: abrouillette@ktslaw.com

Sarah T. Gillman (D.D.C. Bar #NY0316)
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., 8th Fl., Ste. 801
New York, NY 10005
T:(646)289-5593
E: gillman@rfkhumanrights.org

Sarah E. Decker (D.D.C Bar #NY0566)
ROBERT F. KENNEDY HUMAN RIGHTS
1300 19th Street NW, Suite 750
Washington, D.C. 20036
Tel: 908-967-3245
E: decker@rfkhumanrights.org

Fatma E. Marouf (D.D.C. Bar #TX0075)
Sara Zampierin (D.D.C. Bar # TX0074)
Michael P. Bitgood***
Emma Blackmon***
Harris R. Dubin***
Payton Molina***
CIVIL RIGHTS CLINIC & IMMIGRANT RIGHTS
CLINIC, TEXAS A&M SCHOOL OF LAW**
307 W 7th St., Suite LL50
Fort Worth, TX 76102
T: (817) 212-4123
E: fatma.marouf@law.tamu.edu

46

E: sara.zampierin@law.tamu.edu

*Attorneys for Plaintiffs*

\* Attorney admission pending
\*\* Plaintiffs in this case are represented by clinics operated by Texas A&M University School of Law, but this document does not purport to present the school's institutional views, if any.
\*\*\* Petition for certification of law students forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2024, I caused the foregoing and all attachments to be electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

/s/Ronald L. Raider
Ronald L. Raider (DC Bar No. 412978)*
Amanda Brouillette (admitted *pro hac vice*)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA USA 30309
Tel: 404-532-6909
Tel: 404-685-6775
E: rraider@ktslaw.com
E: abrouillette@ktslaw.com

48