# EXHIBIT K

*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

September 29, 2023

MEMORANDUM FOR: Patrick J. Lechleitner
Deputy Director and
Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement

Kerry E. Doyle
Principal Legal Advisor
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

FROM: Dana Salvano-Dunn (b)(6)
Director, Compliance Branch
Office for Civil Rights and Civil Liberties

Susan Mathias /s/
Assistant General Counsel, Legal Counsel Division
Office of the General Counsel

SUBJECT: **Recommendation Memo**: ICE Enforcement and Removal Operations (ERO) Use of the Restraint Device, "the WRAP"[1]
Complaint No. 002577-22-ICE

## I. Purpose

Pursuant to 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, the Office for Civil Rights and Civil Liberties (CRCL) provides recommendations to strengthen U.S. Immigration and Customs Enforcement's (ICE) policies, training, and oversight around the use of the restraint device called "the WRAP."[2]

---

[1] This memorandum does not include personally identifiable information (PII) and can be shared pursuant to Department of Homeland Security Information Sharing and Safeguarding Strategy and all applicable unclassified document dissemination controls. Any relevant PII is included in the attached PII Memo in compliance with DHS Instruction No. 262-16-001.

[2] Under 6 U.S.C. § 345 and 42 U.S.C. § 2000ee-1, CRCL's Compliance Branch receives information and opens complaint investigations into violations of civil rights and civil liberties in DHS policies, programs, and activities.

## II. Background

The WRAP is a 4-point restraint device, otherwise known as a progressive restraint,[3] where an individual is placed in a shoulder harness and restraint for legs in an extended position and locks at the ankles. The WRAP is manufactured by Safe Restraints, Inc., a company founded in 1996 by law enforcement and medical professionals to "design restraint systems that can safely secure and/or transport an individual."[4] When deployed according to manufacturer specifications, the WRAP is stated to "stop active conflicts" and "quickly [] minimize escalation of force and reduce the risk of injury to personnel and the individual."[5] According to Safe Restraints, Inc., "[o]nce restrained, the design of The WRAP positions the subject upright/seated or on their side so that their respiratory ability is maximized,"[6] thus reducing the risk of asphyxiation and other injuries in individuals who are restrained.[7]

Although presented as a device that "reduce[s] risk of injury to personnel and the individual,"[8] use of the WRAP has been met with controversy. An article written in 2022 by Angelika Albaladejo published by LA Progress titled, "WRAP Restraint and Deaths While in Police Custody," raised concerns about the WRAP including pending lawsuits claiming the device had led to deaths.[9]

These devices are typically used by ICE ERO, instead of handcuffs and leg restraints, when an individual in their custody is deemed a safety risk or non-compliant and requires restraint beyond what is generally used during transport. During the investigation, CRCL was informed that ICE began acquiring and using the WRAP between 2016-2018, and has continued its use since. The ICE ERO has deployed it in a variety of settings, including at detention facilities, during transport between facilities, and during removal flights.[10] This investigation focuses on use of the WRAP by ERO when conducting removal flights. This task falls under ERO's office of ICE Air Operations (IAO), which transports noncitizens ordered removed to staging sites to be removed on commercial air operations or on chartered private flights, including Special High-Risk Charter flights, to certain countries.

---

CRCL may issue formal recommendations to a DHS Component or Office when CRCL's complaint investigation reveals a civil rights and civil liberties policy and/or operational gap or violation.

[3] ICE's detention standards define four-or five-point restraints as progressive restraints that are more secure and restrictive which do not allow for freedom of movement without staff assistance. *See* PBNDS 2011 (2016), Standard 2.15, Use of Force and Restraints, V.M., p. 209.

[4] Safe Restraints Inc., available at https://saferestraints.com.

[5] The WRAP Training Materials, available at https://saferestraints.com/?page_id=538.

[6] *Id.*

[7] Id.

[8] Safe Restraints Inc., available at https://saferestraints.com.

[9] *See* "WRAP Restraint and Deaths While in Police Custody" (Feb. 12, 2022) *available at* https://www.laprogressive.com/social-justice/wrap-restraint.

[10] On June 27, 2022, in an interview with ICE WRAP trainer Officer 3, Officer 3 stated ICE began using the WRAP device in 2018. In addition, *See,* Ken Klippenstein, "ICE Orders Dozens of Straitjacket-Like Restraints" (Aug. 15, 2018) *available at* https://tyt.com/stories/4vZLCHuQrYE4uKagy0oyMA/2VrQItMJtYguEcieOc0waA.

In October 2021, CRCL received the first of two matters raising significant concerns with ICE's deployment of the WRAP device. Complainants also alleged that ICE deployed the WRAP on noncitizens who were already subjected to five-point shackle restraints.

## III. Allegations

In October 2021, CRCL opened complaint No. 002577-22-ICE, which was based on a letter received from several non-governmental organizations on behalf of three named and two anonymous noncitizens alleging serious abuses by ICE during removal flights from the United States to Cameroon on October 13, 2020, and November 11, 2020.[11] The letter included 18 eyewitness declarations from noncitizens who were removed on the October and November flights. Specifically, the correspondence alleged the following:

- ICE ERO allegedly used the WRAP before flights, at detention centers and on bus rides, even when the noncitizens had already been subjected to five-point shackle restraints. This resulted in additional pain.
- Rather than the 90-degree position, as recommended by the manufacturer for deployment, noncitizens allegedly were placed in painful and punishing 30-40-degree positions, causing difficulty in breathing and extreme anxiety and fear.
- Allegedly, noncitizens were left in these positions for hours without the required supervision.
- ICE allegedly did not consider relevant medical and psychological conditions of noncitizens that could present serious risks created by use of the WRAP. This included noncitizens with heart or asthma conditions who were allegedly subjected to lengthy WRAP restraint. Also, there was allegedly no consideration of noncitizens' prior exposure to torture or abuse that could trigger panic and claustrophobia with use of the WRAP.
- ICE's use of The WRAP appeared to be routine and occurred without monitoring, documentation, or review.
- The noncitizens allegedly were subjected to inhumane conditions on the flight, including the inability to eat, drink, or use the bathroom.

In January 2022, CRCL received additional allegations regarding ICE's use of the WRAP from Witness at the Border, one of the non-governmental organizations that had submitted the October 2021 correspondence. The new correspondence provided CRCL with 21 written declarations from noncitizens who were formerly detained in ICE custody; 20 of the noncitizens had witnessed the use of the WRAP and one alleged to have been subjected to it. All of the removals purportedly took place on either October 13, 2020, or November 11, 2020. This correspondence alleged the WRAP was used inappropriately to subdue noncitizens and reiterated the allegations previously submitted.

[11] Complaint No. 002577-22-ICE.

## IV. Investigative Process

On October 13, 2021, CRCL initiated its investigation of ICE's use of the WRAP. Through the course of its investigation, CRCL interviewed four Cameroonian citizens who were allegedly placed in the WRAP during removal to Cameroon, 17 noncitizens who witnessed others being placed in the WRAP, ten ERO employees who reportedly staffed the airlifts, and an additional ERO employee who provided information regarding the WRAP and associated training. CRCL also reviewed training documentation and records submitted by ICE, as well as existing use of force and restraints policies.[12]

First, CRCL sought to confirm whether the WRAP was, in fact, used during the October and November 2020 flights by requesting any available written documentation or video footage regarding its specific application on those dates. ICE reported that it could not fulfil this request because no video or documentation existed. Ultimately, ICE did confirm that the WRAP had been used on three non-compliant noncitizens on November 11, 2020, by the Dallas Special Response Team (SRT), however, no information to confirm this, including basic information such as the names of the noncitizens it was used on, was provided.

In addition to the above, as part of its investigation, CRCL relied on the assistance of a subject matter expert in use of force and restraints to provide expert analysis on the applicability and appropriateness of the WRAP by ICE ERO.

## V. Relevant Policies and Procedures

In evaluating these allegations, CRCL assessed whether ICE's use of the WRAP complies with ICE's established policies or procedures. Through the course of this investigation, CRCL identified that ICE does not have written policy that directly governs the WRAP specifically. Nonetheless, CRCL reviewed the following documents as guidance.

1. Memorandum from the Acting Deputy Secretary of Homeland Security to Component Heads, *Department Policy on the Use of Force* (Sep. 7, 2018)[13] which was in effect at the time of the complaint but has since been superseded by Memorandum for Secretary Mayorkas to Agency Leaders, *Policy Statement 044-05-1: Update to the Department Policy on the Use of Force* (Feb. 6, 2023).[14]

2. ICE 2011 Performance Based Detention Standards (PBNDS) (2016 Revisions) – Standard 2.15, Use of Force and Restraints[15]

---

[12] ICE provided ICE Air Operations In-flight Procedures Power Point, OFTP – The WRAP slide deck, and OFTP's The WRAP, June 2020, classroom training plan.
[13] https://www.dhs.gov/sites/default/files/publications/mgmt/law-enforcement/mgmt-dir_044-05-department-policy-on-the-use-of-forcthe.pdf.
[14] https://www.dhs.gov/publication/2023-update-department-policy-use-force
[15] https://www.ice.gov/doclib/detention-standards/2011/2-15.pdf

3. ICE 2019 National Detention Standards (NDS) – Standard 2.8, Use of Force and Restraints[16]

4. ICE Directive 19009.1, Firearms and Use of Force (November 8, 2019), which was in effect at the time of the complaint but has since been superseded by Directive 19009.2, Firearms and Use of Force (August 2, 2021)[17]

5. ICE Firearms and Use of Force Handbook - 19009.1 (November 8, 2019), which was in effect at the time of the complaint but has since been superseded by the Firearms and Use of Force Handbook - 19009.2 (August 2, 2021)[18]

6. ERO Directive 11155.1, Use of Restraints (November 19, 2012)

7. Authorized Restraint Devices Guidelines (September 18, 2017)

8. ICE Air Operations (IAO) – In-Flight Procedures Power Point Presentation (undated)

9. Office of Firearms and Tactical Programs (OFTP) – The WRAP slide deck (undated)

10. OFTP's "The WRAP restraint device" lesson plan (June 2017)

11. ERO Directive 11500.1, IAO Handbook (September 1, 2015)

## VI. Analysis

(b)(5)

**A.** (b)(5)

(b)(5)

[16] https://www.ice.gov/doclib/detention-standards/2019/2_8.pdf.
[17] CRCL reviewed the updated version of the Directive and determined there was no reference made to the WRAP.
[18] CRCL reviewed the updated version of the Handbook and determined there was no reference made to the WRAP.
[19] OTTP Authorized Restraint Devices Guidelines – 09-18-17.pdf



**B.** (b)(5)

(b)(5)

---

[20] PBNDS 2011 (2016), Standard 2.15, Use of Force and Restraints, V.A., E and O. and NDS 2019 Standard 2.8, Use of Force and Restraints, II. A., C., and J.
[21] Interview with Officer 1 and Officer 2, June 27, 2022.
[22] Interview with Officer 1, June 27, 2022.
[23] Interview with Officer 2, June 27, 2022.
[24] *See C.P.X. v. Garcia*, 450 F. Supp. 3d 854 (S.D. Iowa 2020) (holding that punitive use of the WRAP violated the Convention Against Torture and substantive due process rights).

(b)(5)

---

[25] NDS 2019, Standard 2.8, Use of Force and Restraints "requires that all use of force incidents involving noncitizens be documented and the documentation forwarded to ICE/ERO for review" and requires the documentation of the use of restraints (pp. 50). PBNDS 2011 (2016), Standard 2.15, Use of Force and Restraints similarly requires "detailed documentation of all incidents involving use of force" (pp. 211).
[26] Four- or five-point restraints refers to restraints that have been applied to four or five places on an individual's body.
[27] PBNDS 2011 (2016), Standard 2.15, Use of Force and Restraints, V.O, p. 211 and NDS 2019, Standard 2.8, Use of Force and Restraints, II.J. p. 50.
[28] PBNDS 2011, (2016) 2.15 (pp 200 – 213)
[29] ICE response to Short Form, dated February 3, 2022, "22124025.1_Request for Removal Review – 22-CRCL-4021
[30] Interviews of (b)(6).
[31] ICE response to Short Form, dated February 3, 2022, "22124025.1_Request for Removal Review – 22-CRCL-4021"

(b)(5)

[32] ICE response to Short Form, dated February 3, 2022, "22124025.1_Request for Removal Review – 22-CRCL-4021"
[33] PBNDS 2011 (2016) Standard 2.15, p. 212 and NDS 2019, Standard 2.8, pgs. 45-46
[34] PBNDS 2011 (2016) Standard 2.15, p. 212
[35] Interviews with Officer 1 and Officer 2, June 27, 2022.
[36] Interviews with Officer 2 and Officer 3, June 27, 2022.

(b)(5)

C. (b)(5)

(b)(5)

(b)(5) CRCL conducted 17 interviews with noncitizens who had either been subject to the WRAP[37] or witnessed its use in detention, transport, or removal.[38] (b)(5)

(b)(5),(b)(6)

[37] On October 28, 2021, CRCL interviewed four Cameroonian citizens (b)(6) who alleged that they were placed in the WRAP by ICE during removal to Cameroon.

[38] CRCL conducted interviews and received declarations from 17 noncitizens who witnessed the WRAP's application.

[39] Interview with (b)(6)

[40] Interview with (b)(6) who witnessed (b)(6) in the WRAP.

[41] Interviews with (b)(6)

[42] PBNS 2011 (2016), (pp.200)

(b)(5),(b)(6)

1. (b)(5)

Seventeen noncitizens reported that they witnessed the WRAP being used in response to noncitizens resisting their removal.[45] (b)(5)

(b)(5)

2. (b)(5):

Seventeen noncitizens reported that they were subjected to or witnessed the use of the WRAP for all, most of, or several hours of the approximately 18-hour flight to Cameroon.[54] (b)(5)

(b)(5)

---

[43] Interviews with (b)(6)

[44] Interviews with (b)(6) witnesse (b)(6), crying, (b)(6) witnessed people in pain and crying "my chest."

[45] Interviews with (b)(6)

[46] ICE Directive 19009.1, Firearms and Use of Force. See also PBNDS 2011 (2016), Standard 2.15 and NDS 2019, Standard 2.8.

[47] Interview with (b)(6) witnessed "extra force" being used to place noncitizens in the WRAP.

[48] Interview with (b)(6)

[49] Interviews with (b)(6)

[50] Interviews with (b)(6) witnessed this occurring to (b)(6) witness.

[51] Interview with (b)(6)

[52] Interview with (b)(6)

[53] Interview with Officer 1 and (b)(6)(b)(7)(C). Employee Code of Conduct. While the new DHS Use of Force Policy includes a duty to intervene and report improper use of force, this policy was not in effect at the time of the interview. 2023 Update to the Department Policy on Use of Force | Homeland Security (dhs.gov)

[54] Interviews with (b)(6)

3. (b)(5)

(b)(5)

---

[55] Interview with (b)(6) and (b)(6) declarations from (b)(6)
[56] PBNDS 2011 (2016), Standard 2.15, V.N.
[57] PBNDS 2011 (2016), Standard 2.15, V.N.2.
[58] Directive 11155.1, Use of Restraints, Sections 2.4 and 4.1-4.2.
[59] Interviews with (b)(6)
[60] Interview with (b)(6)
[61] Interview with
[62] Interview with
[63] Interview with

(b)(5)

**D.** (b)(5)

In response to CRCL's information request, ICE submitted three sets of training documents that cover the use of the WRAP: the ICE In-Flight Procedures (Power Point Presentation), the OFTP "The WRAP" (slide deck), and OFTP's June 2017 "The WRAP restraint device" classroom training. (b)(5)

(b)(5)

[64] PBNDS 2011 (2016), Standard 2.15, Use of Force and Restraints, Sections II and V.N.2.
[65] PBNDS 2011 (2016), Standard 2.15, Use of Force and Restraints, Section V.I.1.
[66] PBNDS 20111 (2016), 4.3 (pp. 275-276)
[67] IAO, In-Flight Procedures Power Point Presentation
[68] OFTP's January 2018 "The WRAP restraint device" classroom training.
[69] OFTP's January 2018 "The WRAP restraint device" classroom training.

1. (b)(5)

(b)(5)

2. (b)(5)

(b)(5)

[70] Interview with Officer 1.
[71] Interview with Officer 1.
[72] Interview with Officer 1.
[73] Interview with (b)(6)
[74] Interviews with (b)(6)

~~*Protected by Attorney-Client and Deliberative Process Privileges*~~ 13

2024-CRFO-00130-000348

(b)(5)

**E.** (b)(5)

(b)(5)

[75] Interview with (b)(6)
[76] Interview with (b)(6)
[77] Interview with (b)(6), who witnessed (b)(6). in the WRAP.
[78] www.saferestraints.com

~~*Protected by Attorney-Client and Deliberative Process Privileges*~~ 14

2024-CRFO-00130-000349

(b)(5)

## VII. Conclusions and Recommendations

(b)(5)

Accordingly, CRCL makes the following findings and recommendations to ICE:

1. (b)(5)

2.

3.

(b)(5)

4.

5. There is no evidence that any officers received refresher training or that the requirement exists. Refresher training would ensure officers are made aware of policy changes, if any, considerations in applying the WRAP, proper placement of the device, mental and physical health considerations, and documentation. Without changes to the current training, and the lack of policy, CRCL has serious concerns about ICE's continued use of the WRAP.

**Recommendation #6**: ICE should ensure annual re-certification on application and use of the WRAP for those personnel using the device and change training to mitigate the issues raised in this memorandum.

[79] ICE Air Operations (IAO) – In-Flight Procedures Power Point Presentation, OFTP – The WRAP slide deck, and OFTP's January 2018 "The WRAP restraint device" lesson plan.

6. (b)(5)

## VIII. Component Next Steps

It is CRCL's statutory role to advise Department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. We look forward to working with ICE to implement these recommendations.

**We request that ICE provide a response to CRCL within 120 days indicating whether it concurs or does not concur with these recommendations. If you concur, please include an action plan.**

Please send your response and any questions to (b)(6). CRCL will share your response with (b)(6), the Senior Policy Advisor who conducted this investigation.

Copy to:

Corey A. Price
Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Daniel Bible
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Jason B. Mitchell
Chief of Staff
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Dr. Stewart D. Smith
Assistant Director, ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Dr. Ada Rivera
Medical Director, ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Monica Burke
Acting Assistant Director, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Stephen M. Antkowiak
Chief of Staff, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Nathalie Lummert
Acting Deputy Assistant Director, Custody Programs
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Greg Hutton
Unit Chief, Custody Programs
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Deborah Fleischaker
Acting Chief of Staff
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Claire Trickler-McNulty
Assistant Director
Office of Immigration Program Evaluation
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Christopher S. Kelly
Deputy Assistant Director
Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

Scott Lanum
Assistant Director
Office of Diversity and Civil Rights
U.S. Immigration and Customs Enforcement
(b)(6)(b)(7)(C)

(b)(6)(b)(7)(C)

(b)(6)(b)(7)(C)